Argued April 8, reversed and remanded May 31, petition for rehearing
denied June 21, 1977

BOGUE, *Respondent,*

*v.*

McKIBBEN et al, *Appellants.*

(No. 91400, SC 24576)

564 P2d 1031

Carrell F. Bradley, Hillsboro, argued the cause for appellants. With him on the briefs were Schwenn, Bradley and Batchelor, Hillsboro.

John Hemann, Salem, argued the cause for respondent. With him on the brief were Garrett, Seideman & Hemann, Salem.

Before Denecke, Chief Justice, and Holman, Tongue, Bryson, and Lent, Justices.

BRYSON, J.

Holman, J., dissenting opinion.

**BRYSON, J.**

Plaintiff brought this action as personal representative to recover damages for the wrongful death of his minor child. The accident occurred when the deceased was a guest in a motor vehicle driven by defendant Michael McKibben and owned by defendant Barbara Falk. The jury found for defendant Falk and against defendant McKibben. McKibben appeals from the judgment entered against him.

Miss Bogue died of injuries sustained when the vehicle collided with a utility pole at the intersection of Croisan Creek Road South (Croisan Creek) and Madrona Avenue South (Madrona) in Salem, Oregon. Madrona runs generally in an east-west direction and terminates in a "T" intersection with Croisan Creek. Vehicles proceeding west on Madrona must turn either north or south at the intersection, and those vehicles turning to the north are permitted to do so without stopping. A stop sign controls traffic turning south on Croisan Creek off of Madrona. Another stop sign requires traffic proceeding north on Croisan Creek to stop at the Madrona intersection.

Defendant first assigns as error the trial court's denial of his motion for directed verdict and contends the plaintiff failed to produce evidence from which the jury could infer that defendant McKibben was guilty of gross negligence.

If evidence is found from which reasonable men could conclude that defendant's conduct falls within the definition of gross negligence, the case must go to the jury. This is true "in spite of the fact that were we called upon to make a decision as jurors we might conclude from the evidence that the defendant was not liable." *Williamson v. McKenna,* 223 Or 366, 392, 354 P2d 56 (1960).

The evidence, viewed most favorably for plaintiff, is as follows. Madrona, for more than a quarter of a mile, runs downhill to the scene of the accident. A

resident on the upper part of Madrona testified that her attention was called to the vehicle "because of the extra acceleration at my house, like a hot-rod type acceleration"; that halfway down the hill on Madrona the car was going "60" miles per hour. Another eyewitness testified the car was going "thirty-five to forty miles an hour" when it crossed Croisan Creek Road and struck the power pole. The skid marks, depicted by photographs, show defendant drove to the left of the center line on Madrona in his attempt to negotiate the turn.

Defendant was unfamiliar with the road; however, the weather was clear and dry and the intersection and stop sign at the foot of Madrona were clearly visible at a distance of one-quarter mile. Defendant had been told by one of the passengers in the vehicle that he would have to turn right at the bottom of the hill and was further warned of the intersection by a "Stop Ahead" sign located 494 feet before the point where Madrona meets Croisan Creek.

Defendant testified that he had experienced brake problems prior to the accident. Defendant's sister, in her statement to the police, stated that defendant had complained to her the day before the accident that the vehicle's brakes were grabbing.

ORS 30.115 prohibits actions by guests in the absence of proof that the accident was intentional or caused by the defendant's gross negligence or intoxication. ORS 30.115(2) defines gross negligence as follows:

> " 'Gross negligence' refers to negligence which is materially greater than the mere absence of reasonable care under the circumstances, and which is characterized by conscious indifference to or reckless disregard of the rights of others."

In *Williamson v. McKenna, supra,* this court equated "gross negligence" with the concept of "reckless disregard of the rights of others" as defined in 2

Restatement (Second) of Torts 587, § 500 (1965), which provides:

"The actor's conduct is in reckless disregard of the safety of another if he does an act or intentionally fails to do an act which it is his duty to the other to do, knowing or having reason to know of facts which would lead a reasonable man to realize, not only that his conduct creates an unreasonable risk of physical harm to another, but also that such risk is substantially greater than that which is necessary to make his conduct negligent."[1]

Comment *a* to that section further explains the nature of the conduct required for recklessness as follows:

"* * * It must not only be unreasonable, but it must involve a risk of harm to others substantially in excess of that necessary to make the conduct negligent. It must involve an easily perceptible danger of death or substantial physical harm, and the probability that it will so result must be substantially greater than is required for ordinary negligence." *Id.* at 588.

In *Hill v. Garner,* 277 Or 641, 646, 561 P2d 1016 (1977), we noted that

"* * * in order to show gross negligence it is incumbent upon the plaintiff to prove that defendant's conduct, when measured objectively, reveals 'a state of mind indicative of an indifference to the probable consequences of one's acts.' This state of mind has been described as an 'I don't care what happens' attitude. *Bottom v. McClain* [260 Or 186, 489 P2d 940 (1971)] at 191-92. * * *"

This court has been hesitant to allow gross negligence cases to reach the jury where the only evidence is that defendant entered a corner at an excessive speed, lost control and crashed. *Brown v. Bryant,* 250 Or 196, 197, 440 P2d 231 (1968); *Holman v. Barksdale et al,* 223 Or 452, 354 P2d 798 (1960). In *Brown v. Bryant, supra,* we held as a matter of law that "[t]he conduct of the defendant in attempting an approximately 90 degree turn at 35 to 40 miles per hour is

---

[1] See 3 Restatement (Second) Torts Appendix § 500, Reporter's Notes (1966). "No change in substance intended."

evidence of negligence, but it will not suffice to establish gross negligence."

However, the instant case has elements not present in *Brown v. Bryant, supra,* and *Holman v. Barksdale, supra.* There is evidence from which a jury could conclude that this was not a case of mere inadvertence or inattention. The good visibility of the intersection and presence of warning signs as well as the warnings of his passenger all support the conclusion that defendant must have been aware that he was proceeding downhill and approaching an intersection at which he would have to either stop or make a sharp right turn. The car was heavily loaded with four adults and a child in addition to the driver and skidded 89 feet before striking the pole. A jury could find from the evidence that despite this knowledge, the defendant accelerated halfway down the hill to the intersection, reaching a speed of approximately 60 miles per hour. It could further infer from the skid marks that defendant intended to make a wide turn by driving to the left of the center line of Madrona. Finally, the evidence is conclusive that defendant knew that his brakes were malfunctioning and had a tendency to grab.

Defendant's appreciation of the condition of his vehicle is relevant, independent of any causation issues, as evidence of his mental state at the time of the accident and as a measure of the dangerousness of his conduct. A driver who approaches a sharp corner at 35 to 40 miles per hour may be merely negligent if his vehicle is designed and equipped for such driving, but may be considered to be grossly negligent if, measured objectively, he knew or should have known that it was in a defective condition.

■ We conclude that evidence was presented from which a jury could reasonably conclude that defendant knowingly elected to accelerate the vehicle towards the intersection to a speed which a reasonable man would realize created an unreasonable risk of physical

harm to his passengers substantially greater than that which would render his conduct negligent. This is particularly true considering defendant's knowledge of the malfunctioning brakes and the load factor in his car when going downhill. We conclude the trial court did not err in denying defendant's motion for a directed verdict.

The dissent describes the majority as getting "back in the business of tinkering with what constitutes gross negligence" and concludes "that *Williamson,* as subsequently interpreted, is dead * * *."

*Williamson v. McKenna, supra,* was a herculean effort to settle the issue herein discussed and remains a bellwether case. Whenever this court must determine what facts constitute a reasonable man's reckless disregard of the safety of others, there will occasionally be a grey area of difficulty. The question remains as to when a case goes to the jury for determination on the issue of gross negligence.

Since *Williamson* there have been several cases wherein the court has disagreed as to what constitutes gross negligence. *See,* for instance, *Sherman v. McAllister,* 265 Or 630, 509 P2d 1176 (1973); *Amundson v. Hedrick,* 253 Or 185, 452 P2d 308 (1969); *Burghardt v. Olson,* 223 Or 155, 349 P2d 792, 354 P2d 871 (1960)—reconsidered after *Williamson v. McKenna, supra.*

No two cases are alike. The majority does not overrule *Williamson* wherein this court adopted the rule as stated in 2 Restatement (Second) Torts, § 500, *supra,* for application in gross negligence guest-passenger cases. We regard this opinion as a proper application of the rule set forth in the Restatement (Second) of Torts § 500, *supra.*

Defendant next contends that the court "erred in instructing the jury that the statutorily designated speed of 20 mph when approaching and traversing a

[ 489 ]

blind intersection was applicable to the fact situation presented" and in giving the following instruction:

> "There is a further amplification of the designated speed and the statute also provides that, upon approaching within fifty feet and in traversing an intersection of highways where the driver's view in either direction along an intersecting highway within a distance of 200 feet is obstructed, the speed shall be twenty miles an hour."

Defendant properly excepted to the giving of the instruction.

At the time of the accident, ORS 483.104(1)(d)[2] established a designated maximum speed of 20 miles per hour:

> "* * * * *.
>
> "(d) Upon approaching within 50 feet and in traversing an intersection of highways where the driver's view in either direction along any intersecting highway within a distance of 200 feet is obstructed, *except* that when traveling upon a through street or at *traffic-controlled intersections* the district speed applies.
>
> "* * * * *." (Emphasis added.)

The evidence in this case is undisputed that the intersection of Madrona and Croisan Creek was a controlled intersection. The plaintiff concedes that "the intersection is traffic controlled by virtue of * * * stop sign[s] which [permit] free right turns" and "the giving of the instruction regarding the blind intersection may have been unnecessary" but contends that the giving of the instruction did not constitute prejudicial error.

We have no way of knowing the specific grounds upon which the jury concluded that defendant McKibben was grossly negligent. However, it is apparent that an instruction permitting the jury to find that defendant approached and entered the intersection in excess of the designated statutory speed could not help

---

[2]Repealed effective July 1, 1976, by Oregon Laws 1975, ch 451, section 291.

but be prejudicial to defendant's case. There is no posted speed on Madrona going west, down the hill. The trial court's instruction should not have been given, and we reverse and remand this case for a new trial.

Defendant also contends that the trial court erred in "denying defendant's motion for the court to rule that the vicinity of the accident was not a residential area" and in giving the following instruction:

> "In connection with this basic speed rule, we have and the law provides for certain designated speeds. Now, in this case the designated speed for a residential area is twenty miles per hour, but I want to give you a definition of what a residential area is. A residential area means the territory contiguous to a highway, not comprising a business district, when the frontage on one or both sides of such highway for a distance of 300 feet or more is mainly occupied by dwellings, churches, public parks within cities, or other residential service facilities or by dwellings used for business. So if you were to find from the evidence that the area immediately preceding where the accident occurred—in other words, coming down the last 300 feet of Madrona Avenue—was not a residential district, in other words, if on both sides of the highway there was not on one side or the other for 300 feet mainly occupied by residences, then the twenty miles per hour would not apply at that place, and the fifty-five miles an hour general speed designation in the state would apply.
>
> "\* \* \* \* \*.
>
> "I think I was in error. I told you that the speed in a residential district is twenty miles an hour. The speed in a residential district is, in fact, the designated speed, twenty-fives miles per hour. \* \* \*"

This instruction was based upon ORS 483.104(2)(a)[3]

---

[3] Repealed effective July 1, 1976, by Oregon Laws 1975, ch 451, section 291. The pertinent portion of ORS 483.104(2)(a) provided:

"Any speed in excess of the speeds designated in this section or under ORS 483.106 or 483.108 shall be prima facie evidence of violation of ORS 483.102. The speeds designated in this section are:

"\* \* \* \* \*.

"(2) Twenty-five miles per hour:

"(a) In any residence district.

"\* \* \* \* \*"

and ORS 483.020(1), which, at the time of the accident, designated a maximum speed of 25 miles per hour in residence districts and defined a residence district as

> "* * * the territory contiguous to a highway not comprising a business district when the frontage on one or both sides of such highway for a distance of 300 feet or more is mainly occupied by dwellings, churches, public parks within cities or other residential service facilities or by dwellings and buildings used for business." ORS 483.020(1).

■ The question of whether or not the vicinity of the accident was a residence district should not, in the instant case, have been sent to the jury as a fact-law question over defendant's timely objection. *Staples v. Senders,* 164 Or 244, 96 P2d 215, 101 P2d 232 (1940), involved the applicability of an ordinance and aptly describes the rationale of the rule, stating at page 260:

> "It was the duty of the court to construe the ordinance, and it was error so to charge the jury as to permit them to determine whether or not its provisions governed the rights of the parties. The question, for example, whether the opening in the floor was a wellhole within the meaning of the ordinance was a question of law and not of fact. Were it to be held otherwise, then in another case presenting identical facts another jury could find that such an opening was not a wellhole and that the ordinance was inapplicable, and there would be no rule for the guidance either of property owners or the officers of the city."

*See also, Dungey v. Fairview Farms, Inc.,* 205 Or 615, 290 P2d 181 (1955). This is the intent expressed in Uniform Jury Instruction No. 70.02, Indicated Speeds.

■ It is important that traffic laws be interpreted and applied uniformly and in a manner which will permit motorists and law officers alike to determine the proper course of conduct. The fact that "residence district" is specifically defined does not alter this rule.

There may be cases where the particular factual aspect of the definition is sufficiently disputed to warrant a jury determination of that particular fact.

Such would be the case if there was conflicting testimony as to whether or not a particular building was "intended as a place of human habitation" and "reasonably capable of present occupancy" at the time of the accident. *See Marshall v. Mullin,* 212 Or 421, 427-28, 320 P2d 258 (1958). However, in the instant case there is evidence from which the court could clearly make a decision. No particular or specific factual dispute required jury determination. The trial court should have decided the issue as one of law and instructed the jury accordingly.

Reversed and remanded for new trial.

**HOLMAN, J.,** dissenting.

The court is again back in the business of tinkering with what constitutes gross negligence. Prior to 1960 this court had evolved a pattern, by the process of adjudicating factual situations, by which one who regularly engaged in litigation could, with some degree of success, prognosticate results in a given set of circumstances. Upon this scene burst the decision of *Williamson v. McKenna,* 223 Or 366, 354 P2d 56 (1960), which, following a complete reexamination of the subject, described gross negligence (previously described as greater or more than ordinary negligence) as being the equivalent of what was described in Section 500 of 2 Restatement of the Law of Torts (1934) as reckless conduct, which, in turn, was equated with "wanton or wilful misconduct." This description did very little to enlighten, except that the words "wanton or wilful misconduct," in the factual context in which they were used, told the bench and bar that in order for conduct to constitute gross negligence, there must exist much greater foolhardiness than had previously been the case.

As recounted in *Williamson,* its decision was the result of a series of gross negligence cases which had come to the court and about which there had been disagreement. At the same time *Williamson* was before the court, there were two department cases

which had been set for rehearing. See *Secanti v. Jones et al,* 223 Or 598, 349 P2d 274, 355 P2d 601, and *Burghardt v. Olson,* 223 Or 155, 349 P2d 792, 354 P2d 871 (1960). The change in the law brought about by this trilogy of cases is best illustrated by what happened in *Secanti.* This was a case in which a 17-year-old, out with his girl friend late at night, ran a plainly visible stop sign and collided with a fully lighted vehicle, traveling on the intersecting street, which had been in plain sight for a considerable period of time. The original opinion held that there was sufficient evidence of gross negligence to go to the jury and reasoned thusly:

> "The evidence recited would have been sufficient to permit the jury to find that the defendant must have seen both the stop sign and the other car and decided that he would take the chance of beating the car through the intersection. In other words, it could be inferred that he was confronted with an observable obvious hazard and despite ample opportunity to avoid it, decided to accept the hazard.
>
> "* * * * *.
>
> "The facts and the circumstances of this case require us to consider that the defendant entered into an intersection immediately in front of an approaching automobile without reducing his speed, without heeding a stop sign, and when there was no obstruction or impairment of visibility and with an inferable consciousness of the hazard. It was necessary for the jury to decide if these circumstances demonstrated a reckless disregard of plaintiff's safety. [Citations.]" 223 Or at 602-05.

This was the fairly standard way of treating gross negligence up to that time; however, upon rehearing, it was held that there was insufficient evidence of gross negligence to go to the jury.

Because of excessive speed, defendant in the present case was unable, while driving another's car, to negotiate a curve on a road he had never driven before but which curve it could be inferred he knew was there since it was posted and he had been told of it. In the words of the majority opinion,

"* * * There is evidence from which a jury could conclude that this was not a case of mere inadvertence or inattention. The good visibility of the intersection and presence of warning signs [also present in *Secanti*] as well as the warnings of his passenger [warning of the curve made sometime before reaching it and not shown to have been induced by his speed] all support the conclusion that defendant must have been aware that he was proceeding downhill and approaching an intersection at which he would have to either stop or make a sharp right turn. The car was heavily loaded with four adults and a child in addition to the driver and skidded 89 feet before striking the pole. A jury could find from the evidence that despite this knowledge, the defendant accelerated half way down the hill to the intersection, reaching a speed of approximately 60 miles per hour [600 feet from the intersection]. It could further infer from the skid marks that defendant intended to make a wide turn by driving to the left of the center line of Madrona. Finally, the evidence is conclusive that defendant knew that his brakes were malfunctioning and had a tendency to grab.

"Defendant's appreciation of the condition of his vehicle is relevant, independent of any causation issues, as evidence of his mental state at the time of the accident and as a measure of the dangerousness of his conduct. A driver who approaches a sharp corner at 35 to 40 miles per hour may be merely negligent if his vehicle is designed and equipped for such driving, but may be considered to be grossly negligent if, measured objectively, he knew or should have known that it was in a defective condition.

"We conclude that evidence was presented from which a jury could reasonably conclude that defendant knowingly elected to accelerate the vehicle towards the intersection to a speed which a reasonable man would realize created an unreasonable risk of physical harm to his passengers substantially greater than that which would render his conduct negligent. This is particularly true considering defendant's knowledge of the malfunctioning brakes and the load factor in his car when going downhill. We conclude the trial court did not err in denying defendant's motion for a directed verdict."

The parallel in reasoning between the original

opinion in *Secanti* and the above excerpt in the majority opinion is striking. From given evidence defendant must have known of the danger—he did not heed it; he therefore deliberately encountered it—he was grossly negligent. Every person who ever failed to negotiate a curve he knew was there or every person who ever ran a plainly visible stop sign and thereupon collided with a plainly visible vehicle would fit the same reasoning. Decisions subsequent to *Williamson* have regularly held that nonsuits were proper in guest cases of this kind and have allowed recovery only in situations in which the negligence was truly horrendous—something which would fall in the "Oh, my God!" category. What had been a fairly steady volume of successful gross negligence cases slowed to a trickle. As a matter of curiosity, the writer of this dissent examined the last 20 bound volumes of the Oregon Reports[1] and found only nine cases in which plaintiff's right to recovery upon gross negligence was upheld. Five of them involved the consumption of alcohol;[2] three involved truly shocking facts;[3] and in one case the issue of gross negligence was conceded and not raised on appeal.[4]

The divergence of the present decision from the cases decided in the past 17 years is illustrated by *Brown v. Bryant,* 250 Or 196, 440 P2d 231 (1968), in which the defendant unsuccessfully attempted a 90-degree turn at 35 to 40 miles per hour (the same speed at which the present curve was attempted), and which case the court gave the courtesy of a per curiam opinion. The majority attempts to distinguish *Brown* by pointing out that in the present case there was good

---

[1] 254 Oregon to 273 Oregon inclusive.

[2] *Gatten v. Widman,* 269 Or 112, 523 P2d 1007 (1974); *Jenson v. Spencer,* 269 Or 411, 525 P2d 153 (1974); *Trotter v. McKellip,* 265 Or 334, 509 P2d 31 (1973); *Gray v. Warren,* 263 Or 38, 500 P2d 711 (1972); *McIntosh v. Lawrance,* 255 Or 569, 469 P2d 628 (1970).

[3] *Lochard v. Vosika,* 267 Or 213, 515 P2d 1320 (1973); *Sherman v. McAllister,* 265 Or 630, 509 P2d 1176 (1973); *Bottom v. McClain,* 260 Or 186, 489 P2d 940 (1971).

[4] *Cheyne v. Deike,* 270 Or 58, 526 P2d 557 (1974).

visibility, defendant knew the curve was there (so also in *Brown*), there were four adults in the car and the brakes were bad. No one blamed the accident on the brakes. The simple truth is that in both cases the vehicles were attempting to make a similar curve at a similar speed and neither one made it. The relevant facts can be dressed up with verbiage, but that does not change them.

It is apparent that a majority of the present personnel of this court are more nearly of a mind with the opinions as they existed before *Williamson* and that *Williamson,* as subsequently interpreted, is dead, although the majority have not seen fit to give it a public burial. The writer of this dissent couldn't care less whether guest cases are treated as they were prior to *Williamson* or as the majority of the court now propose to treat them. However, from the standpoint of stability and predictability, such changes are regrettable and should be avoided. The law should not be changed with the length of the chancellor's nose. The change brought about by *Williamson* was not in the interest of stability and neither is the present change. The situation before us is not one in which a change in the interpretation of the law is dictated by prior faulty reasoning or because the reason for such a law is no longer valid due to a change in values or in other societal conditions. Whatever the legislature intended by this statute, that intention has remained constant; it is only the court which vacillates, as evidenced by its interpretations through the years.

The kind of change represented here is not in the best interest of stable and predictable results. It is a change without a rationale. I therefore dissent.

Denecke, C. J., joins in this dissent.