### GREGORY D. HANKS *v.* POWDER RIDGE RESTAURANT CORPORATION ET AL.
### (SC 17327)

Sullivan, C. J., and Borden, Norcott, Katz, Palmer, Vertefeuille and Zarella, Js.[1]

---

[1] This case originally was argued before a panel of this court consisting of Justices Borden, Norcott, Katz, Palmer and Vertefeuille. Thereafter, the court, pursuant to Practice Book § 70-7 (b), sua sponte, ordered that the

Argued April 18—officially released November 29, 2005

case be considered en banc. Accordingly, Chief Justice Sullivan and Justice Zarella were added to the panel. They have read the record, briefs and transcript of the oral argument.

William F. Gallagher, with whom, on the brief, was David McCarry, for the appellant (plaintiff).

Laura Pascale Zaino, with whom, on the brief, were John B. Farley and Kevin M. Roche, for the appellees (defendants).

Opinion

SULLIVAN, C. J. This appeal[2] arises out of a complaint filed by the plaintiff, Gregory D. Hanks, against the defendants, Powder Ridge Restaurant Corporation and White Water Mountain Resorts of Connecticut, Inc., doing business as Powder Ridge Ski Resort, seeking compensatory damages for injuries the plaintiff sustained while snowtubing at the defendants' facility. The trial court rendered summary judgment in favor of the defendants, concluding that this court's decision in Hyson v. White Water Mountain Resorts of Connecticut, Inc., 265 Conn. 636, 829 A.2d 827 (2003), precluded the plaintiff's negligence claim as a matter of law. We reverse the judgment of the trial court.

The record reveals the following factual and procedural history. The defendants operate a facility in Middlefield, known as Powder Ridge, at which the public, in exchange for a fee, is invited to ski, snowboard and snowtube. On February 16, 2003, the plaintiff brought his three children and another child to Powder Ridge to snowtube. Neither the plaintiff nor the four children had ever snowtubed at Powder Ridge, but the snowtub-

---

[2] The plaintiff appealed from the judgment of the trial court to the Appellate Court, and we transferred the appeal to this court pursuant to General Statutes § 51-199 (c) and Practice Book § 65-2.

ing run was open to the public generally, regardless of prior snowtubing experience, with the restriction that only persons at least six years old or forty-four inches tall were eligible to participate. Further, in order to snowtube at Powder Ridge, patrons were required to sign a "Waiver, Defense, Indemnity and Hold Harmless Agreement, and Release of Liability" (agreement). The plaintiff read and signed the agreement on behalf of himself and the four children. While snowtubing, the plaintiff's right foot became caught between his snow-tube and the man-made bank of the snowtubing run, resulting in serious injuries that required multiple surgeries to repair.

Thereafter, the plaintiff filed the present negligence action against the defendants. Specifically, the plaintiff alleges that the defendants negligently caused his injuries by: (1) permitting the plaintiff "to ride in a snow tube that was not of sufficient size to ensure his safety while on the snow tubing run"; (2) "fail[ing] to properly train, supervise, control or otherwise instruct the operators of the snow tubing run in the proper way to run the snow tubing course to ensure the safety of the patrons, such as the plaintiff"; (3) "fail[ing] to properly groom the snow tubing run so as to direct patrons . . . such as the plaintiff away from the sidewalls of [the] run"; (4) "plac[ing] carpet at the end of the snow tubing run which had the tendency to cause the snow tubes to come to an abrupt halt, spin or otherwise change direction"; (5) "fail[ing] to properly landscape the snow tubing run so as to provide an adequate up slope at the end of the run to properly and safely slow snow tubing patrons such as the plaintiff"; (6) "fail[ing] to place warning signs on said snow tubing run to warn patrons such as the plaintiff of the danger of colliding with the side wall of [the] snow tubing run"; and (7) "fail[ing] to place hay bales or other similar materials on the sides of the snow tubing run in order to direct patrons

such as the plaintiff away from the sidewalls of [the] run."

The defendants, in their answer to the complaint, denied the plaintiff's allegations of negligence and asserted two special defenses. Specifically, the defendants alleged that the plaintiff's injuries were caused by his own negligence and that the agreement relieved the defendants of liability, "even if the accident was due to the negligence of the defendants." Thereafter, the defendants moved for summary judgment, claiming that the agreement barred the plaintiff's negligence claim as a matter of law. The trial court agreed and rendered summary judgment in favor of the defendants. Specifically, the trial court determined, pursuant to our decision in *Hyson* v. *White Water Mountain Resorts of Connecticut, Inc.*, supra, 265 Conn. 640–44, that the plaintiff, by signing the agreement, unambiguously had released the defendants from liability for their allegedly negligent conduct. Thereafter, the plaintiff moved to reargue the motion for summary judgment. The trial court denied the plaintiff's motion and this appeal followed.

The plaintiff raises two claims on appeal. First, the plaintiff claims that the trial court improperly concluded that the agreement clearly and expressly releases the defendants from liability for negligence. Specifically, the plaintiff contends that a person of ordinary intelligence reasonably would not have believed that, by signing the agreement, he or she was releasing the defendants from liability for personal injuries caused by negligence and, therefore, pursuant to *Hyson* v. *White Water Mountain Resorts of Connecticut, Inc.*, supra, 265 Conn. 643, the agreement does not bar the plaintiff's negligence claim. Second, the plaintiff claims that the agreement is unenforceable because it violates public policy. Specifically, the plaintiff contends that a recreational operator cannot, consistent with public

policy, release itself from liability for its own negligent conduct where, as in the present case, the operator offers its services to the public generally, for a fee, and requires patrons to sign a standardized exculpatory agreement as a condition of participation. We disagree with the plaintiff's first claim, but agree with his second claim.

Before reaching the substance of the plaintiff's claims on appeal, we review this court's decision in *Hyson*. The plaintiff in *Hyson* was injured while snowtubing at Powder Ridge and, thereafter, filed a complaint against the defendant, White Water Mountain Resorts of Connecticut, Inc., alleging that the defendant's negligence proximately had caused her injuries.[3] Id., 637–39. Prior to snowtubing at Powder Ridge, the plaintiff had signed an exculpatory agreement entitled "RELEASE FROM LIABILITY." Id., 638 and n.3. The issue presented in *Hyson* was whether the exculpatory agreement released the defendant from liability for its negligent conduct and, consequently, barred the plaintiff's negligence claims as a matter of law. Id., 640. We concluded that it did not. Id.

In arriving at this conclusion, we noted that there exists "widespread support in other jurisdictions for a rule requiring that any agreement intended to exculpate a party for its own negligence state so expressly"; id., 641–42; and that this court previously had acknowledged "the well established principle . . . that '[t]he law does not favor contract provisions which relieve a person from his own negligence . . . .' " Id., 643. Accordingly, we determined that "the better rule is that a party cannot be released from liability for injuries resulting from its future negligence in the absence of

---

[3] We note that White Water Mountain Resorts of Connecticut, Inc., is also a defendant in the present matter and that the plaintiff in the present matter was also injured while snowtubing at Powder Ridge.

language that expressly so provides." Id. This rule "prevents individuals from inadvertently relinquishing valuable legal rights" and "does not impose . . . significant cost[s]" on entities seeking to exculpate themselves from liability for future negligence. Id. Examining the exculpatory agreement at issue in *Hyson*, we observed that "the release signed by the plaintiff [did] not specifically refer to possible negligence by the defendant" but, instead, only referred to "inherent and other risks involved in [snowtubing] . . . ."[4] (Internal quotation marks omitted.) Id., 640. Thus, "[a] person of ordinary intelligence reasonably could believe that, by signing this release, he or she was releasing the defendant only from liability for damages caused by dangers inherent in the activity of snowtubing." Id., 643. Accordingly, we concluded that the exculpatory agreement did not

---

[4] That exculpatory agreement provided:

"SNOWTUBING

"RELEASE FROM LIABILITY

"PLEASE READ CAREFULLY BEFORE SIGNING

"1. I accept use of a snowtube and accept full responsibility for the care of the snowtube while in my possession.

"2. I understand that there are inherent and other risks involved in SNOW-TUBING, including the use of lifts and snowtube, and it is a dangerous activity/sport. These risks include, but are not limited to, variations in snow, steepness and terrain, ice and icy conditions, moguls, rocks, trees, and other forms of forest growth or debris (above or below the surface), bare spots, lift terminals, cables, utility lines, snowmaking equipment and component parts, and other forms [of] natural or man made obstacles on and/or off chutes, as well as collisions with equipment, obstacles or other snowtubes. Snow chute conditions vary constantly because of weather changes and snowtubing use. Be aware that snowmaking and snow grooming may be in progress at any time. These are some of the risks of SNOWTUBING. All of the inherent risks of SNOWTUBING present the risk of serious and/or fatal injury.

"3. I agree to hold harmless and indemnify Powder Ridge, White Water Mountain Resorts of Connecticut, Inc. and/or any employee of the aforementioned for loss or damage, including any loss or injuries that result from damages related to the use of a snowtube or lift.

"I, the undersigned, have read and understand the above release of liability." (Internal quotation marks omitted.) *Hyson* v. *White Water Mountain Resorts of Connecticut, Inc.*, supra, 265 Conn. 638 n.3.

expressly release the defendants from liability for future negligence and, therefore, did not bar the plaintiff's claims. Consequently, we declined to decide whether a well drafted exculpatory agreement expressly releasing a defendant from prospective liability for future negligence could be enforced consistent with public policy. See id., 640 ("we do not reach the issue of whether a well drafted agreement purporting to have such an effect would be enforceable"); id., 643 n.11 ("we do not decide today whether a contract having such express language would be enforceable to release a party from liability for its negligence").

As an initial matter, we set forth the appropriate standard of review. "[T]he standard of review of a trial court's decision to grant a motion for summary judgment is well established. Practice Book [§ 17-49] provides that summary judgment shall be rendered forthwith if the pleadings, affidavits and any other proof submitted show that there is no genuine issue as to any material fact and that the moving party is entitled to judgment as a matter of law." (Internal quotation marks omitted.) *D'Eramo* v. *Smith*, 273 Conn. 610, 619, 872 A.2d 408 (2005).

I

We first address the plaintiff's claim that the agreement does not expressly release the defendants from liability for personal injuries incurred as a result of their own negligence as required by *Hyson*. Specifically, the plaintiff maintains that an ordinary person of reasonable intelligence would not understand that, by signing the agreement, he or she was releasing the defendants from liability for future negligence. We disagree.

"[T]he law does not favor contract provisions which relieve a person from his own negligence . . . ." *Hyson* v. *White Water Mountain Resorts of Connecticut, Inc.*,

supra, 265 Conn. 643. "[T]he law's reluctance to enforce exculpatory provisions of this nature has resulted in the development of an exacting standard by which courts measure their validity. So, it has been repeatedly emphasized that unless the intention of the parties is expressed in unmistakable language, an exculpatory clause will not be deemed to insulate a party from liability for his own negligent acts . . . . Put another way, it must appear plainly and precisely that the limitation of liability extends to negligence or other fault of the party attempting to shed his ordinary responsibility . . . .

"Not only does this stringent standard require that the drafter of such an agreement make its terms unambiguous, but it mandates that the terms be understandable as well. Thus, a provision that would exempt its drafter from any liability occasioned by his fault should not compel resort to a magnifying glass and lexicon. . . . Of course, this does not imply that only simple or monosyllabic language can be used in such clauses. Rather, what the law demands is that such provisions be clear and coherent . . . ." (Internal quotation marks omitted.) *B & D Associates, Inc.* v. *Russell*, 73 Conn. App. 66, 72, 807 A.2d 1001 (2002), quoting *Gross* v. *Sweet*, 49 N.Y.2d 102, 107–108, 400 N.E.2d 306, 424 N.Y.S.2d 365 (1979); see also *Hyson* v. *White Water Mountain Resorts of Connecticut, Inc.*, supra, 265 Conn. 643 ("a party cannot be released from liability for injuries resulting from its future negligence in the absence of language that expressly so provides"). "Although ordinarily the question of contract interpretation, being a question of the parties' intent, is a question of fact . . . [w]here there is definitive contract language, the determination of what the parties intended by their contractual commitments is a question of law." (Internal quotation marks omitted.) *Goldberg* v. *Hartford Fire Ins. Co.*, 269 Conn. 550, 559–60, 849 A.2d 368 (2004).

The agreement[5] at issue in the present case provides in relevant part: "I understand that there are inherent risks involved in snowtubing, including the risk of seri-

---

[5] The complete agreement provides:

"Waiver, Defense, Indemnity and Hold Harmless Agreement, and Release of Liability

"In consideration for the privilege of participating in snowtubing at Powder Ridge Ski Area, I hereby agree that:

"1. I understand that there are inherent risks involved in snowtubing, including the risk of serious physical injury or death and *I fully assume all risks associated with [s]nowtubing,* even if due to the NEGLIGENCE of White Water Mountain Resorts of Connecticut, Inc., d/b/a Powder Ridge Ski Area and its Affiliates, Officers, Directors, Agents, Servants and/or Employees, including but not limited to: variations in the snow conditions; steepness and terrain; the presence of ice, moguls, bare spots and objects beneath the snowtubing surface such as rocks, debris and tree stumps; collisions with objects both on and off the snowtubing chutes such as hay bales, trees, rocks, snowmaking equipment, barriers, lift cables and equipment, lift towers, lift attendants, employees, volunteers, other patrons and spectators or their property; equipment or lift condition or failure; lack of safety devices or inadequate safety devices; lack of warnings or inadequate warnings; lack of instructions or inadequate instructions; use of any lift; and the like.

"2. I, for myself and for my heirs, assigns, successors, executors, administrators, and legal representatives, *agree I will defend, indemnify and hold harmless* White Water Mountain Resorts of Connecticut, Inc., d/b/a Powder Ridge Ski Area, its Affiliates, Officers, Directors, Agents, Servants and Employees from any and all claims, suits or demands by anyone arising from my use of the Powder Ridge snowtubing facilities and equipment including claims of NEGLIGENCE on the part of White Water Mountain Resorts of Connecticut, Inc., d/b/a Powder Ridge Ski Area, its Affiliates, Officers, Directors, Agents, Servants and/or Employees.

"3. I, for myself and for my heirs, assigns, successors, executors, administrators, and legal representatives, hereby release, and agree that *I will not sue,* White Water Mountain Resorts of Connecticut, Inc., d/b/a Powder Ridge Ski Area, its Affiliates, Officers, Directors, Agents, Servants and/or Employees for money damages for personal injury or property damage sustained by me while using the snowtubing facilities and equipment even if due to the NEGLIGENCE of White Water Mountain Resorts of Connecticut, Inc., d/b/a Powder Ridge Ski Area, its Affiliates, Officers, Directors, Agents, Servants and/or Employees.

"*I have read this Waiver, Defense, Indemnity and Hold Harmless Agreement, and Release of Liability and fully understand its terms.* I further understand that by signing this agreement that I am giving up substantial legal rights. I have not been induced to sign this agreement by any promise or representation and I sign it voluntarily and of my own free will." (Emphasis in original.)

ous physical injury or death and *I fully assume all risks associated with* [s]*nowtubing,* even if due to the NEGLIGENCE of [the defendants] . . . including but not limited to: variations in the snow conditions; steepness and terrain; the presence of ice, moguls, bare spots and objects beneath the snowtubing surface such as rocks, debris and tree stumps; collisions with objects both on and off the snowtubing chutes such as hay bales, trees, rocks, snowmaking equipment, barriers, lift cables and equipment, lift towers, lift attendants, employees, volunteers, other patrons and spectators or their property; equipment or lift condition or failure; lack of safety devices or inadequate safety devices; lack of warnings or inadequate warnings; lack of instructions or inadequate instructions; use of any lift; and the like. . . . I . . . *agree I will defend, indemnify and hold harmless* [the defendants] . . . from any and all claims, suits or demands by anyone arising from my use of the Powder Ridge snowtubing facilities and equipment including claims of NEGLIGENCE on the part of [the defendants] . . . . I . . . hereby release, and agree that *I will not sue* [the defendants] . . . for money damages for personal injury or property damage sustained by me while using the snowtubing facilities and equipment even if due to the NEGLIGENCE of [the defendants] . . . ." (Emphasis in original.)

We conclude that the agreement expressly and unambiguously purports to release the defendants from prospective liability for negligence. The agreement explicitly provides that the snowtuber *"fully assume*[s] *all risks associated with* [s]*nowtubing,* even if due to the NEGLIGENCE" of the defendants. (Emphasis in original.) Moreover, the agreement refers to the negligence of the defendants three times and uses capital letters to emphasize the term "negligence." Accordingly, we conclude that an ordinary person of reasonable intelligence would understand that, by signing the

agreement, he or she was releasing the defendants from liability for their future negligence.[6]

The plaintiff claims, however, that the agreement does not expressly release the defendants from liability for their prospective negligence because the agreement "define[s] the word 'negligence' solely by reference to inherent [risks] of the activity." We disagree. The agreement states that the snowtuber *"fully assume[s] all risks associated with [s]nowtubing,* even if due to the NEGLIGENCE of [the defendants]" and provides a nonexhaustive list of such risks. (Emphasis in original.) We acknowledge that some of the risks listed arguably can be characterized as inherent risks because they are innate to the activity, "are beyond the control of the

---

[6] The plaintiff claims that the trial court improperly rendered summary judgment in the present matter because "there [was] a question of fact as to [the plaintiff's] understanding of the scope of the release." We reject this claim. "It is the general rule that a contract is to be interpreted according to the intent expressed in its language and not by an intent the court may believe existed in the minds of the parties." (Internal quotation marks omitted.) *Pesino* v. *Atlantic Bank of New York,* 244 Conn. 85, 94, 709 A.2d 540 (1998). Accordingly, where the language of a contract is clear and unambiguous, "[a] party may not assert as a defense to an action on [the] contract that [he] did not understand what [he] was signing." *John M. Glover Agency* v. *RDB Building, LLC,* 60 Conn. App. 640, 645, 760 A.2d 980 (2000).

Regardless, the plaintiff's deposition testimony establishes that he understood the scope of the agreement, but did not believe that the defendants would seek to enforce the agreement or that the agreement would be upheld as a matter of law. See part II of this opinion. Specifically, the plaintiff testified: "I did not understand that I was saying it was okay for Powder Ridge to willingly kill me or injure me or my children or anyone else that participated in the ride, and it is my understanding of the form as it's written, that Powder Ridge has the right, from this document, to take my life, injure me, injure my children, without regard or responsibility. That is my understanding of the form now. At the time I read that, I did not believe that, and I had that understanding of the words as they're written and I did not believe that any organization would attempt to enforce language of that kind nor would any court uphold it." The plaintiff further testified: "My son, who at that time was [twelve], read [the agreement] as well and he said, 'Dad, don't sign this thing.' And I looked at it and I said, 'It's so patently egregious, I don't see how it could be enforced.' He was right and I was wrong. 'Out of the mouths of babes.'"

[recreational] area operator and cannot be minimized by the operator's exercise of reasonable care." *Jagger* v. *Mohawk Mountain Ski Area, Inc.*, 269 Conn. 672, 692, 849 A.2d 813 (2004). Other risks listed in the agreement, for example, "lack of safety devices or inadequate safety devices; lack of warnings or inadequate warnings; lack of instructions or inadequate instructions" are not inherent risks. The recreational operator has control over safety devices, warnings and instructions, and can ensure their adequacy through the exercise of reasonable care. Thus, a snowtuber who, by virtue of signing the present agreement, assumes the risk of inadequate safety devices, warnings or instructions, necessarily assumes the risk of the recreational operator's negligence.

We conclude that the trial court properly determined that the agreement in the present matter expressly purports to release the defendants from liability for their future negligence and, accordingly, satisfies the standard set forth by this court in *Hyson.*

II

We next address the issue we explicitly left unresolved in *Hyson* v. *White Water Mountain Resorts of Connecticut, Inc.*, supra, 265 Conn. 640, namely, whether the enforcement of a well drafted exculpatory agreement purporting to release a snowtube operator from prospective liability for personal injuries sustained as a result of the operator's negligent conduct violates public policy. We conclude that it does and, accordingly, reverse the judgment of the trial court.

Although it is well established "that parties are free to contract for whatever terms on which they may agree"; (internal quotation marks omitted) *Gibson* v. *Capano*, 241 Conn. 725, 730, 699 A.2d 68 (1997); it is equally well established "that contracts that violate public policy are unenforceable." *Solomon* v. *Gilmore*, 248 Conn. 769,

774, 731 A.2d 280 (1999). "[T]he question [of] whether a contract is against public policy is [a] question of law dependent on the circumstances of the particular case, over which an appellate court has unlimited review." (Internal quotation marks omitted.) *Parente* v. *Pirozzoli*, 87 Conn. App. 235, 245, 866 A.2d 629 (2005), citing 17A Am. Jur. 2d 312, Contracts § 327 (2004).

As previously noted, "[t]he law does not favor contract provisions which relieve a person from his own negligence . . . ." (Internal quotation marks omitted.) *Hyson* v. *White Water Mountain Resorts of Connecticut, Inc.*, supra, 265 Conn. 643. This is because exculpatory provisions undermine the policy considerations governing our tort system. "[T]he fundamental policy purposes of the tort compensation system [are] compensation of innocent parties, shifting the loss to responsible parties or distributing it among appropriate entities, and deterrence of wrongful conduct . . . . It is sometimes said that compensation for losses is the primary function of tort law . . . [but it] is perhaps more accurate to describe the primary function as one of determining when compensation [is] required. . . . An equally compelling function of the tort system is the prophylactic factor of preventing future harm . . . . The courts are concerned not only with compensation of the victim, but with admonition of the wrongdoer." (Citations omitted; internal quotation marks omitted.) *Lodge* v. *Arett Sales Corp.*, 246 Conn. 563, 578–79, 717 A.2d 215 (1998). Thus, it is consistent with public policy "to posit the risk of negligence upon the actor" and, if this policy is to be abandoned, "it has generally been to allow or require that the risk shift to another party better or equally able to bear it, not to shift the risk to the weak bargainer." *Tunkl* v. *Regents of the University of California*, 60 Cal. 2d 92, 101, 383 P.2d 441, 32 Cal. Rptr. 33 (1963).

Although this court previously has not addressed the enforceability of a release of liability for future negligence, the issue has been addressed by many of our sister states. A frequently cited standard for determining whether exculpatory agreements violate public policy was set forth by the Supreme Court of California in *Tunkl* v. *Regents of the University of California,* supra, 60 Cal. 2d 98–101. In *Tunkl,* the court concluded that exculpatory agreements violate public policy if they affect the public interest adversely; id., 96–98; and identified six factors (*Tunkl* factors) relevant to this determination: "[1] [The agreement] concerns a business of a type generally thought suitable for public regulation. [2] The party seeking exculpation is engaged in performing a service of great importance to the public, which is often a matter of practical necessity for some members of the public. [3] The party holds himself out as willing to perform this service for any member of the public who seeks it, or at least for any member coming within certain established standards. [4] As a result of the essential nature of the service, in the economic setting of the transaction, the party invoking exculpation possesses a decisive advantage of bargaining strength against any member of the public who seeks his services. [5] In exercising a superior bargaining power the party confronts the public with a standardized adhesion contract of exculpation, and makes no provision whereby a purchaser may pay additional reasonable fees and obtain protection against negligence. [6] Finally, as a result of the transaction, the person or property of the purchaser is placed under the control of the seller, subject to the risk of carelessness by the seller or his agents." Id., 98–101. The court clarified that an exculpatory agreement may affect the public interest adversely even if some of the *Tunkl* factors are not satisfied.[7] Id., 101.

---

[7] In *Tunkl,* the plaintiff filed suit against a charitable research hospital for personal injuries allegedly incurred as a result of the negligence of two physicians employed by the hospital. *Tunkl* v. *Regents of the University of*

Various states have adopted the *Tunkl* factors to determine whether exculpatory agreements affect the public interest adversely and, thus, violate public policy. See, e.g., *Anchorage* v. *Locker*, 723 P.2d 1261, 1265 (Alaska 1986); *Olson* v. *Molzen*, 558 S.W.2d 429, 431 (Tenn. 1977); *Wagenblast* v. *Odessa School District*, 110 Wash. 2d 845, 851–52, 758 P.2d 968 (1988). Other states have developed their own variations of the *Tunkl* factors; see, e.g., *Jones* v. *Dressel*, 623 P.2d 370, 376 (Colo. 1981) ("[i]n determining whether an exculpatory agreement is valid, there are four factors which a court must consider: [1] the existence of a duty to the public; [2] the nature of the service performed; [3] whether the contract was fairly entered into; and [4] whether the intention of the parties is expressed in clear and unambiguous language"); *Rawlings* v. *Layne & Bowler Pump Co.*, 93 Idaho 496, 499–500, 465 P.2d 107 (1970) ("express agreements exempting one of the parties for negligence are to be sustained except where: [1] one party is at an obvious disadvantage in bargaining power; [2] a public duty is involved [public utility companies, common carriers]"); while still others have adopted a totality of the circumstances approach. See, e.g., *Wolf* v. *Ford*, 335 Md. 525, 535, 644 A.2d 522 (1994) (expressly declining to adopt *Tunkl* factors because "[t]he ultimate determination of what constitutes the public interest must be made considering the totality of the circumstances of any given case against the backdrop of current societal expectations"); *Dalury* v. *S-K-I, Ltd.*, 164 Vt. 329, 333–34, 670 A.2d 795 (1995) (same). The Virginia Supreme Court, however, has determined that all exculpatory agreements purporting to release tortfeasors

*California*, *supra*, 60 Cal. 2d 94. Upon admission, the plaintiff was required to sign an exculpatory agreement that released the hospital from "any and all liability for the negligent or wrongful acts or omissions of its employees . . . ." (Internal quotation marks omitted.) Id. Applying the *Tunkl* factors, the court determined that the exculpatory agreement was unenforceable because it violated public policy. Id., 101–104.

from future liability for personal injuries are unenforceable because "[t]o hold that it was competent for one party to put the other parties to the contract at the mercy of its own misconduct . . . can never be lawfully done where an enlightened system of jurisprudence prevails. Public policy forbids it . . . ." (Internal quotation marks omitted.) *Hiett* v. *Lake Barcroft Community Assn.*, 244 Va. 191, 194, 418 S.E.2d 894 (1992).

Having reviewed the various methods for determining whether exculpatory agreements violate public policy, we conclude, as the *Tunkl* court itself acknowledged, that "[n]o definition of the concept of public interest can be contained within the four corners of a formula." *Tunkl* v. *Regents of the University of California*, supra, 60 Cal. 2d 98. Accordingly, we agree with the Supreme Courts of Maryland and Vermont that "[t]he ultimate determination of what constitutes the public interest must be made considering the totality of the circumstances of any given case against the backdrop of current societal expectations." *Wolf* v. *Ford*, supra, 335 Md. 535; *Dalury* v. *S-K-I, Ltd.*, supra, 164 Vt. 333–34. Thus, our analysis is guided, but not limited, by the *Tunkl* factors, and is informed by any other factors that may be relevant given the factual circumstances of the case and current societal expectations.

We now turn to the merits of the plaintiff's claim. The defendants are in the business of providing snowtubing services to the public generally, regardless of prior snowtubing experience, with the minimal restriction that only persons at least six years old or forty-four inches tall are eligible to participate. Given the virtually unrestricted access of the public to Powder Ridge, a reasonable person would presume that the defendants were offering a recreational activity that the whole family could enjoy safely. Indeed, this presumption is borne out by the plaintiff's own testimony. Specifically, the plaintiff testified that he "trusted that [the defendants]

would, within their good conscience, operate a safe ride."

The societal expectation that family oriented recreational activities will be reasonably safe is even more important where, as in the present matter, patrons are under the care and control of the recreational operator as a result of an economic transaction. The plaintiff, in exchange for a fee, was permitted access to the defendants' snowtubing runs and was provided with snowtubing gear. As a result of this transaction, the plaintiff was under the care and control of the defendants and, thus, was subject to the risk of the defendants' carelessness. Specifically, the defendants designed and maintained the snowtubing run and, therefore, controlled the steepness of the incline, the condition of the snow and the method of slowing down or stopping patrons. Further, the defendants provided the plaintiff with the requisite snowtubing supplies and, therefore, controlled the size and quality of the snowtube as well as the provision of any necessary protective gear. Accordingly, the plaintiff voluntarily relinquished control to the defendants with the reasonable expectation of an exciting, but reasonably safe, snowtubing experience.

Moreover, the plaintiff lacked the knowledge, experience and authority to discern whether, much less ensure that, the defendants' snowtubing runs were maintained in a reasonably safe condition. As the Vermont Supreme Court observed, in the context of the sport of skiing, it is consistent with public policy "to place responsibility for maintenance of the land on those who own or control it, with the ultimate goal of keeping accidents to the minimum level possible. [The] [d]efendants, not recreational skiers, have the expertise and opportunity to foresee and control hazards, and to guard against the negligence of their agents and employees. They alone can properly maintain and inspect their

premises, and train their employees in risk management. They alone can insure against risks and effectively spread the costs of insurance among their thousands of customers. Skiers, on the other hand, are not in a position to discover and correct risks of harm, and they cannot insure against the ski area's negligence.

"If the defendants were permitted to obtain broad waivers of their liability, an important incentive for ski areas to manage risk would be removed, with the public bearing the cost of the resulting injuries. . . . It is illogical, in these circumstances, to undermine the public policy underlying business invitee law and allow skiers to bear risks they have no ability or right to control."[8] (Citations omitted.) *Dalury* v. *S-K-I, Ltd.*, supra, 164 Vt. 335. The concerns expressed by the court in *Dalury* are equally applicable to the context of snowtubing, and we agree that it is illogical to permit snowtubers, and the public generally, to bear the costs of risks that they have no ability or right to control.[9]

[8] Exculpatory agreements, like the one at issue in the present matter, shift the costs of injuries from the tortfeasor to the person injured. As a consequence, health care insurance providers or the state, through its provision of medicaid benefits, absorb the costs of the tortfeasor's negligence. These costs necessarily are passed on to the population of the state through higher health care premiums and state taxes. Accordingly, in the present matter, it ultimately would be the population generally, and not the snowtube operators and their patrons, who would bear the costs if these agreements were to be enforced.

[9] The dissent claims that "[t]he *Dalury* court, like the majority in the present case, concluded that a recreational activity affected the public interest because of the considerable public participation." The dissent mischaracterizes both the conclusion of the Vermont Supreme Court in *Dalury* v. *S-K-I, Ltd.*, supra, 164 Vt. 335, and our conclusion today. In *Dalury*, the court did not rely solely on the volume of public participation in determining that exculpatory agreements violate public policy in the context of skiing. Rather, the court relied on the following relevant factors: "(1) the ski area operated a facility open to the general public, (2) the ski area advertised and invited persons of every level of skiing ability onto its premises, (3) the ski area, and not recreational skiers, had the expertise and opportunity to foresee and control hazards and to guard against the negligence of its employees and agents, (4) the ski area was in a better position to insure against the risks of its own negligence and spread the cost of the insurance

Further, the agreement at issue was a standardized adhesion contract offered to the plaintiff on a "take it or leave it" basis. The "most salient feature [of adhesion contracts] is that they are not subject to the normal bargaining processes of ordinary contracts." *Aetna Casualty & Surety Co.* v. *Murphy*, 206 Conn. 409, 416, 538 A.2d 219 (1988); see also Black's Law Dictionary (7th Ed. 1999) (defining adhesion contract as "[a] standard form contract prepared by one party, to be signed by the party in a weaker position, [usually] a consumer, who has little choice about the terms"). Not only was the plaintiff unable to negotiate the terms of the agreement, but the defendants also did not offer him the option of procuring protection against negligence at an additional reasonable cost. See Restatement (Third), Torts, Apportionment of Liability § 2, comment (e), p. 21 (2000) (factor relevant to enforcement of contractual limit on liability is "whether the party seeking exculpation was willing to provide greater protection against

among its customers, and (5) if ski areas were permitted to obtain broad waivers of their liability, incentives for them to manage risks would be removed, with the public bearing the cost." *Spencer* v. *Killington, Ltd.*, 167 Vt. 137, 141, 702 A.2d 35 (1997) (discussing *Dalury*). Likewise, we conclude today that the agreement at issue in this case violates public policy, not solely because of the volume of public participation, but because: (1) the defendants invite the public generally to snowtube at their facility, regardless of snowtubing ability; (2) snowtubers are under the care and control of the defendants as a result of an economic transaction; (3) the defendants, not recreational snowtubers, have the knowledge, experience and authority to maintain the snowtubing runs in reasonably safe condition, to determine whether the snowtubing equipment is adequate and reasonably safe, and to guard against the negligence of its employees and agents; (4) the defendants are in a better position to insure against the risk of their negligence and to spread the costs of insurance to their patrons; (5) if we were to uphold the present agreement under the facts of this case, the defendants would be permitted to obtain broad waivers of their liability and the incentive for them to maintain a reasonably safe snowtubing environment would be removed, with the public bearing the cost; (6) the agreement at issue is a standardized adhesion contract, offered to snowtubers on a "take it or leave it" basis, and without the opportunity to purchase protection against negligence at an additional, reasonable fee; and (7) the defendants had superior bargaining authority.

tortious conduct for a reasonable, additional fee"). Moreover, the defendants did not inform prospective snowtubers prior to their arrival at Powder Ridge that they would have to waive important common-law rights as a condition of participation. Thus, the plaintiff, who traveled to Powder Ridge in anticipation of snowtubing that day, was faced with the dilemma of either signing the defendants' proffered waiver of prospective liability or forgoing completely the opportunity to snowtube at Powder Ridge. Under the present factual circumstances, it would ignore reality to conclude that the plaintiff wielded the same bargaining power as the defendants.

The defendants contend, nevertheless, that they did not have superior bargaining power because, unlike an essential public service, "[s]nowtubing is a voluntary activity and the plaintiff could have just as easily decided not to participate."[10] We acknowledge that snowtubing is a voluntary activity, but we do not agree that there can never be a disparity of bargaining power in the context of voluntary or elective activities.[11] See

---

[10] The defendants also claim, and the dissent agrees, that the defendants did not have superior bargaining power because the plaintiff "could have participated in snowtubing elsewhere, either on that day or another day." We are not persuaded. Snowtubing is a seasonal activity that requires the provision of specific supplies and particular topographic and weather conditions. Although the dissent correctly states that " 'snowtubing occurs regularly at locations all across the state, including parks, backyards and golf courses' "; we point out that, even when weather conditions are naturally appropriate for snowtubing, not all individuals are fortunate enough to have access to places where snowtubing is both feasible topographically and permitted freely. Moreover, the dissent argues that the plaintiff had ample opportunity to select a snowtubing environment "based on whatever safety considerations he felt were relevant." As already explained in this opinion, however, the defendants, not the plaintiff, had the requisite knowledge and experience to determine what safety considerations are relevant to snowtubing. As such, it was reasonable for the plaintiff to presume that the defendants, who are in the business of supplying snowtubing services, provide the safest snowtubing alternative.

[11] We need not decide whether an exculpatory agreement concerning a voluntary recreational activity violates public policy if the *only* factor militat-

*Dalury* v. *S-K-I, Ltd.*, supra, 164 Vt. 335 ("[w]hile interference with an essential public service surely affects the public interest, those services do not represent the universe of activities that implicate public concerns"). Voluntary recreational activities, such as snowtubing, skiing, basketball, soccer, football, racquetball, karate, ice skating, swimming, volleyball or yoga, are pursued by the vast majority of the population and constitute an important and healthy part of everyday life. Indeed, this court has previously recognized the public policy interest of promoting vigorous participation in such activities. See, e.g., *Jagger* v. *Mohawk Mountain Ski Area, Inc.*, supra, 269 Conn. 702 (important public policy interest in encouraging vigorous participation in skiing); *Jaworski* v. *Kiernan*, 241 Conn. 399, 409, 696 A.2d 332 (1997) (important public policy interest in promoting vigorous participation in soccer). In the present case, the defendants held themselves out as a provider of a healthy, fun, family activity. After the plaintiff and his family arrived at Powder Ridge eager to participate in the activity, however, the defendants informed the plaintiff that, not only would they be immune from claims arising from the inherent risks of the activity, but they would not be responsible for injuries resulting from their own carelessness and negligence in the operation of the snowtubing facility. We recognize that the plaintiff had the option of walking away. We cannot say, however, that the defendants had no bargaining advantage under these circumstances.

For the foregoing reasons, we conclude that the agreement in the present matter affects the public interest adversely and, therefore, is unenforceable because

ing against enforcement of the agreement is a disparity in bargaining power because, in the present matter, there are additional factors that combine to render the agreement contrary to public policy. See footnote 9 of this opinion.

it violates public policy.[12] Accordingly, the trial court improperly rendered summary judgment in favor of the defendants.

The defendants and the dissent point out that our conclusion represents the "distinct minority view" and is inconsistent with the majority of sister state authority upholding exculpatory agreements in similar recreational settings. We acknowledge that most states uphold adhesion contracts releasing recreational operators from prospective liability for personal injuries caused by their own negligent conduct. Put simply, we disagree with these decisions for the reasons already explained in this opinion. Moreover, we find it significant that many states uphold exculpatory agreements in the context of *simple* negligence, but refuse to enforce such agreements in the context of *gross* negligence. See, e.g., *Farina* v. *Mt. Bachelor, Inc.*, 66 F.3d 233, 235–36 (9th Cir. 1995) (Oregon law); *Wheelock* v. *Sport Kites, Inc.*, 839 F. Sup. 730, 736 (D. Haw. 1993), superseded in part by Haw. Rev. Stat. § 663-1.54 (1997) (recreational providers liable for simple negligence in addition to gross negligence); *McFann* v. *Sky Warriors, Inc.*, 268 Ga. App. 750, 758, 603 S.E.2d 7 (2004), cert. denied, 2005 Ga. LEXIS 69 (January 10, 2005); *Boucher* v. *Riner*, 68 Md. App. 539, 543, 514 A.2d 485 (1986); *Zavras* v. *Capeway Rovers Motorcycle Club, Inc.*, 44

---

[12] We clarify that our conclusion does not extend to the risks inherent in the activity of snowtubing. As we have explained, inherent risks are those risks that are innate to the activity, "are beyond the control of the [recreational] area operator and cannot be minimized by the operator's exercise of reasonable care." *Jagger* v. *Mohawk Mountain Ski Area, Inc.*, supra, 269 Conn. 692 (distinguishing between inherent risks of skiing and ski operator's negligence); see also *Spencer* v. *Killington, Ltd.*, 167 Vt. 137, 143, 702 A.2d 35 (1997) (same). For example, risks inherent in the sport of skiing include, but are not limited to, the risk of collision with another skier or a tree outside the confines of the slope. See Public Acts 2005, No. 05-78, § 2. The risks inherent in each type of recreational activity will necessarily vary, and it is common knowledge that some recreational activities are inherently more dangerous than others.

Mass. App. 17, 18–19, 687 N.E.2d 1263 (1997); *Schmidt* v. *United States*, 912 P.2d 871, 874 (Okla. 1996); *Adams* v. *Roark*, 686 S.W.2d 73, 75–76 (Tenn. 1985); *Conradt* v. *Four Star Promotions, Inc.*, 45 Wash. App. 847, 852, 728 P.2d 617 (1986); see also *New Light Co.* v. *Wells Fargo Alarm Services*, 247 Neb. 57, 62–65, 525 N.W.2d 25 (1994); 8 S. Williston, Contracts (4th Ed. 1998) § 19:23, pp. 291–97 ("[a]n attempted exemption from liability for a future intentional tort or crime or for a future willful or grossly negligent act is generally held void, although a release exculpating a party from liability for negligence may also cover gross negligence where the jurisdiction has abolished the distinction between degrees of negligence and treats all negligence alike"). Connecticut does not recognize degrees of negligence and, consequently, does not recognize the tort of gross negligence as a separate basis of liability. See, e.g., *Matthiessen* v. *Vanech*, 266 Conn. 822, 833 and n.10, 836 A.2d 394 (2003). Accordingly, although in some states recreational operators cannot, consistent with public policy, release themselves from prospective liability for conduct that is more egregious than *simple* negligence, in this state, were we to adopt the position advocated by the defendants, recreational operators would be able to release their liability for such conduct unless it rose to the level of *recklessness*. Id., 832 (recklessness is "a conscious choice of a course of action either with knowledge of the serious danger to others involved in it or with knowledge of facts which would disclose this danger to any reasonable man, and the actor must recognize that his conduct involves a risk substantially greater . . . than that which is necessary to make his conduct negligent" [internal quotation marks omitted]). As a result, recreational operators would lack the incentive to exercise even *slight* care, with the public bearing the costs of the resulting injuries. See 57A Am. Jur. 2d 296, Negligence § 227 (2004)

(" 'gross negligence' is commonly defined as very great or excessive negligence, or as the want of, or failure to exercise, even slight or scant care or 'slight diligence' "). Such a result would be inconsistent with the public policy of this state.

The judgment is reversed and the case is remanded for further proceedings according to law.

In this opinion KATZ, VERTEFEUILLE and ZARE-LLA, Js., concurred.

NORCOTT, J., with whom BORDEN and PALMER, Js., join, dissenting. Although I concur in part I of the majority opinion, I disagree with its conclusion in part II, namely, that the prospective release of liability for negligence executed by the plaintiff, Gregory D. Hanks, in this case is unenforceable as against public policy. I would follow the overwhelming majority of our sister states and would conclude that prospective releases from liability for negligence are permissible in the context of recreational activities. Accordingly, I respectfully dissent from the majority's decision to take a road that is, for many persuasive reasons, far less traveled.

I begin by noting that "[i]t is established well beyond the need for citation that parties are free to contract for whatever terms on which they may agree. This freedom includes the right to contract for the assumption of known or unknown hazards and risks that may arise as a consequence of the execution of the contract. Accordingly, in private disputes, a court must enforce the contract as drafted by the parties and may not relieve a contracting party from anticipated or actual difficulties undertaken pursuant to the contract . . . ." *Holly Hill Holdings* v. *Lowman*, 226 Conn. 748, 755–56, 628 A.2d 1298 (1993). Nevertheless, contracts that violate public policy are unenforceable. See, e.g., *Solomon* v. *Gilmore*, 248 Conn. 769, 774, 731 A.2d 280 (1999).

In determining whether prospective releases of liability violate public policy, the majority adopts the Vermont Supreme Court's totality of the circumstances approach.[1] See *Dalury* v. *S-K-I, Ltd.*, 164 Vt. 329, 334, 670 A.2d 795 (1995). Although it also purports to consider the widely accepted test articulated by the California Supreme Court in *Tunkl* v. *Regents of the University of California*, 60 Cal. 2d 92, 383 P.2d 441, 32 Cal. Rptr. 33 (1963), the majority actually accords the test only nominal consideration. Because I consider the *Tunkl* factors to be dispositive, I address them at length.

"[T]he attempted but invalid [release agreement] involves a transaction which exhibits some or all of the following characteristics. [1] It concerns a business of a type generally thought suitable for public regulation. [2] The party seeking exculpation is engaged in performing a service of great importance to the public, which is often a matter of practical necessity for some members of the public. [3] The party holds himself out as willing to perform this service for any member of the public who seeks it, or at least for any member coming within certain established standards. [4] As a result of the essential nature of the service, in the economic setting of the transaction, the party invoking exculpation possesses a decisive advantage of bargaining strength against any member of the public who seeks his services. [5] In exercising a superior bargaining power the party confronts the public with a standardized adhesion contract of exculpation, and

---

[1] The majority also cites *Wolf* v. *Ford*, 335 Md. 525, 535, 644 A.2d 522 (1994), in support of its totality of the circumstances approach. The *Wolf* court concluded that a release executed in the context of a stockbroker-client relationship did not implicate the public interest. Id., 527–28. Such a result is incongruous with the vast majority of American law and I am aware of no other case in which a court held that a release of liability for negligence in such a sensitive context did not implicate the public interest. In my view, *Wolf* illustrates the significant problem inherent in employing an amorphous "totality of the circumstances" test.

makes no provision whereby a purchaser may pay additional reasonable fees and obtain protection against negligence. [6] Finally, as a result of the transaction, the person or property of the purchaser is placed under the control of the seller, subject to the risk of carelessness by the seller or his agents." Id., 98–101.

"[N]ot all of the *Tunkl* factors need be satisfied in order for an exculpatory clause to be deemed to affect the public interest. The [*Tunkl* court] conceded that '[n]o definition of the concept of public interest can be contained within the four corners of a formula' and stated that the transaction must only 'exhibit some or all' of the identified characteristics. . . . Thus, the ultimate test is whether the exculpatory clause affects the public interest, not whether all of the characteristics that help reach that conclusion are satisfied." (Citations omitted.) *Health Net of California, Inc.* v. *Dept. of Health Services*, 113 Cal. App. 4th 224, 237–38, 6 Cal. Rptr. 3d 235 (2003), review denied, 2004 Cal. LEXIS 2043 (March 3, 2004).

Notwithstanding the statutory origins of the *Tunkl* factors,[2] numerous other states have adopted them to determine whether a prospective release violates public policy under their common law. See, e.g., *Morgan* v.

---

[2] The *Tunkl* court construed California Civil Code § 1668, which provides: "All contracts which have for their object, directly or indirectly, to exempt anyone from responsibility for his own fraud, or willful injury to the person or property of another, or violation of law, whether willful or negligent, are against the policy of the law." (Internal quotation marks omitted.) *Tunkl* v. *Regents of the University of California*, supra, 60 Cal. 2d 95. Despite the sweeping language of the statute, California courts had construed it inconsistently, with many allowing prospective releases from liability for negligence. See id., 95–98. The *Tunkl* court, in reconciling conflicting lower court decisions, confined the effect of § 1668 on releases from liability for negligence to situations affecting the public interest, stating: "While obviously no public policy opposes private, voluntary transactions in which one party, for a consideration, agrees to shoulder a risk which the law would otherwise have placed upon the other party, [circumstances affecting the public interest] pose a different situation." Id., 101.

*South Central Bell Telephone Co.*, 466 So. 2d 107, 117 (Ala. 1985); *Anchorage* v. *Locker*, 723 P.2d 1261, 1265 (Alaska 1986); *La Frenz* v. *Lake County Fair Board*, 172 Ind. App. 389, 395, 360 N.E.2d 605 (1977); *Lynch* v. *Santa Fe National Bank*, 97 N.M. 554, 558–59, 627 P.2d 1247 (1981); *Olson* v. *Molzen*, 558 S.W.2d 429, 431 (Tenn. 1977); *Wagenblast* v. *Odessa School District*, 110 Wash. 2d 845, 852, 758 P.2d 968 (1988); *Schutkowski* v. *Carey*, 725 P.2d 1057, 1060 (Wyo. 1986).[3]

Applying the six *Tunkl* factors to the sport of snowtubing, I note that the first, second, fourth and sixth factors support the defendants, Powder Ridge Restaurant Corporation and White Water Mountain Resorts of Connecticut, Inc., doing business as Powder Ridge Ski Resort, which operate the Powder Ridge facility, while the third and fifth factors support the plaintiff. Accordingly, I now turn to a detailed examination of each factor as it applies to this case.

The first of the *Tunkl* factors, that the business is of a type thought suitable for regulation, cuts squarely in favor of upholding the release. Snowtubing runs generally are not subject to extensive public regulation. Indeed, the plaintiff points to no statutes or regulations that affect snowtubing, and I have located only one statutory reference to it. This sole reference, contained in No. 05-78, § 2, of the 2005 Public Acts, explicitly

---

[3] I note that still other states have chosen to adopt variations on the *Tunkl* factors. See, e.g., *Jones* v. *Dressel*, 623 P.2d 370, 376 (Colo. 1981) ("[i]n determining whether an exculpatory agreement is valid, there are four factors which a court must consider: [1] the existence of a duty to the public; [2] the nature of the service performed; [3] whether the contract was fairly entered into; and [4] whether the intention of the parties is expressed in clear and unambiguous language"); *Rawlings* v. *Layne & Bowler Pump Co.*, 93 Idaho 496, 499–500, 465 P.2d 107 (1970) ("[o]n the basis of these authorities we hold that express agreements exempting one of the parties for negligence are to be sustained except where: [1] one party is at an obvious disadvantage in bargaining power; [2] a public duty is involved [public utility companies, common carriers]").

exempts snowtubing from the scope of General Statutes (Rev. to 2005) § 29-212, which applies to liability for injuries sustained by skiers.[4] Thus, while the legislature has chosen to regulate, to some extent, the sport of skiing, it conspicuously has left snowtubing untouched.

The second *Tunkl* factor also works in the defendants' favor. Snowtubing is not an important public service. Courts employing the *Tunkl* factors have found

[4] Public Act 05-78, § 2, which amended General Statutes (Rev. to 2005) § 29-212 effective October 1, 2005, provides: "(a) For the purposes of this section:

"(1) 'Skier' includes any person who is using a ski area for the purpose of skiing or who is on the skiable terrain of a ski area as a spectator or otherwise, *but does not include (A) any person using a snow tube provided by a ski area operator,* and (B) any person who is a spectator while in a designated spectator area during any event;

"(2) 'Skiing' means sliding downhill or jumping on snow or ice using skis, a snowboard, snow blades, a snowbike, a sit-ski or any other device that is controllable by its edges on snow or ice or is for the purpose of utilizing any skiable terrain, *but does not include snow tubing operations provided by a ski area operator;* and

"(3) 'Ski area operator' means a person who owns or controls the operation of a ski area and such person's agents and employees.

"(b) Each skier shall assume the risk of and legal responsibility for any injury to his or her person or property caused by the hazards inherent in the sport of skiing. Such hazards include, but are not limited to: (1) Variations in the terrain of the trail or slope which is marked in accordance with subdivision (3) of section 29-211, as amended by this act, or variations in surface or subsurface snow or ice conditions, except that no skier assumes the risk of variations which are caused by the ski area operator unless such variations are caused by snow making, snow grooming or rescue operations; (2) bare spots which do not require the closing of the trail or slope; (3) conspicuously placed or, if not so placed, conspicuously marked lift towers; (4) trees or other objects not within the confines of the trail or slope; (5) loading, unloading or otherwise using a passenger tramway without prior knowledge of proper loading and unloading procedures or without reading instructions concerning loading and unloading posted at the base of such passenger tramway or without asking for such instructions; and (6) collisions with any other person by any skier while skiing, except that collisions with on-duty employees of the ski area operator who are skiing and are within the scope of their employment at the time of the collision shall not be a hazard inherent in the sport of skiing.

"(c) The provisions of this section shall not apply in any case in which it is determined that a claimant's injury was not caused by a hazard inherent in the sport of skiing." (Emphasis added.)

this second element satisfied in the contexts of hospital admission and treatment, residential rental agreements, banking, child care services, telecommunications and public education, including interscholastic sports. See *Henrioulle* v. *Marin Ventures, Inc.*, 20 Cal. 3d 512, 573 P.2d 465, 143 Cal. Rptr. 247 (1978) (residential rental agreements); *Tunkl* v. *Regents of the University of California*, supra, 60 Cal. 2d 92 (hospitals); *Gavin W.* v. *YMCA of Metropolitan Los Angeles*, 106 Cal. App. 4th 662, 131 Cal. Rptr. 2d 168 (2003) (child care); *Vilner* v. *Crocker National Bank*, 89 Cal. App. 3d 732, 152 Cal. Rptr. 850 (1979) (banking); *Morgan* v. *South Central Bell Telephone Co.*, supra, 466 So. 2d 107 (telephone companies); *Anchorage* v. *Locker*, supra, 723 P.2d 1261 (telephone companies); *Wagenblast* v. *Odessa School District*, supra, 110 Wash. 2d 845 (public schools and interscholastic sports). The public nature of these industries is undeniable and each plays an important and *indispensable* role in everyday life. Snowtubing, by contrast, is purely a recreational activity.

The fourth *Tunkl* factor also counsels against the plaintiff's position that snowtubing affects the public interest because snowtubing is not an essential activity. The plaintiff's only incentive for snowtubing was recreation, not some other important personal interest such as, for example, health care, banking or insurance. The plaintiff would not have suffered any harm by opting not to snowtube at Powder Ridge, because snowtubing is not so significant a service that a person in his position would feel compelled to agree to any terms offered rather than forsake the opportunity to participate. Furthermore, "[u]nlike other activities that require the provision of a certain facility, snowtubing occurs regularly at locations all across the state, including parks, backyards and golf courses." *Hyson* v. *White Water Mountain Resorts of Connecticut, Inc.*, 265 Conn. 636, 650 n.4, 829 A.2d 827 (2003) (*Norcott, J.*, dissenting). Thus,

the plaintiff had ample opportunity to snowtube in an environment of his choosing, which he could have selected based on whatever safety considerations he felt were relevant. In the absence of a compelling personal need and a limited choice of facilities, I cannot conclude that the defendants enjoyed a significant bargaining advantage over the plaintiff.

Finally, the sixth *Tunkl* factor weighs against a determination that the release implicates the public interest. The plaintiff did not place his person or property under the defendants' control. Unlike the patient who lies unconscious on the operating table or the child who is placed in the custody of a day care service, the Powder Ridge patron snowtubes on his own, without entrusting his person or property to the defendants' care. In fact, the attraction of snowtubing and other recreational activities often is the lack of control associated with participating.

In contrast, the third and fifth *Tunkl* factors support the plaintiff's position. With respect to the third factor, although the defendants restricted access to the snowtubing run to persons at least six years old or forty-four inches tall, this minimal restriction does not diminish the fact that only a small class of the general public is excluded from participation. See *Tunkl* v. *Regents of the University of California,* supra, 60 Cal. 2d 102 (research hospital that only accepted certain patients nevertheless met third prong of *Tunkl* because it accepted anyone who exhibited medical condition that was being researched at hospital). Such a small exclusion does not diminish the invitation to the public at large to partake in snowtubing at the defendants' facility, because the snowtubing run is open to any person who fits within certain easily satisfied parameters. See id., 99–101.

Finally, I examine the fifth *Tunkl* factor, namely, whether the release agreement is an "adhesion contract

. . . ." Id., 100. "[The] most salient feature [of adhesion contracts] is that they are not subject to the normal bargaining processes of ordinary contracts." *Aetna Casualty & Surety Co.* v. *Murphy*, 206 Conn. 409, 416, 538 A.2d 219 (1988). Although the plaintiff made no attempt to bargain as to the terms of the release, it defies logic to presume that he could have done so successfully. As the majority correctly notes, the defendants presented patrons with a "take it or leave it" situation, conditioning access to the snowtubing run on signing the release agreement. Accordingly, the fifth *Tunkl* factor indicates that the agreement does affect the public interest.

In sum, I conclude that, under the *Tunkl* factors, the defendants' release at issue in this case does not violate public policy with respect to the sport of snowtubing. This conclusion is consistent with the vast majority of sister state authority, which upholds releases of liability in a variety of recreational or athletic settings that are akin to snowtubing as not violative of public policy. See, e.g., *Barnes* v. *Birmingham International Raceway, Inc.*, 551 So. 2d 929, 933 (Ala. 1989) (automobile racing); *Valley National Bank* v. *National Assn. for Stock Car Auto Racing*, 153 Ariz. 374, 378, 736 P.2d 1186 (App. 1987) (spectator in pit area at automobile race); *Plant* v. *Wilbur*, 345 Ark. 487, 494–96, 47 S.W.3d 889 (2001) (same); *Madison* v. *Superior Court*, 203 Cal. App. 3d 589, 602, 250 Cal. Rptr. 299 (1988) (scuba diving), review denied, 1988 Cal. LEXIS 1511 (October 13, 1988); *Heil Valley Ranch, Inc.* v. *Simkin*, 784 P.2d 781, 785 (Colo. 1989) (horseback riding); *Theis* v. *J & J Racing Promotions*, 571 So. 2d 92, 94 (Fla. App. 1990) (automobile racing), review denied, 581 So. 2d 168 (Fla. 1991); *Bien* v. *Fox Meadow Farms Ltd.*, 215 Ill. App. 3d 337, 341, 574 N.E.2d 1311 (horseback riding), appeal denied, 142 Ill. 2d 651, 584 N.E.2d 126 (1991); *Clanton* v. *United Skates of America*, 686 N.E.2d 896, 899–900

(Ind. App. 1997) (roller skating); *Boucher* v. *Riner*, 68 Md. App. 539, 551, 514 A.2d 485 (1986) (skydiving); *Lee* v. *Allied Sports Associates, Inc.*, 349 Mass. 544, 551, 209 N.E.2d 329 (1965) (spectator at automobile race); *Lloyd* v. *Sugarloaf Mountain Corp.*, 833 A.2d 1, 4 (Me. 2003) (mountain biking); *Gara* v. *Woodbridge Tavern*, 224 Mich. App. 63, 66–68, 568 N.W.2d 138 (1997) (recreational sumo wrestling); *Schlobohm* v. *Spa Petite, Inc.*, 326 N.W.2d 920, 926 (Minn. 1982) (weightlifting at fitness center); *Mayer* v. *Howard*, 220 Neb. 328, 336, 370 N.W.2d 93 (1985) (motorcycle racing); *Barnes* v. *New Hampshire Karting Assn., Inc.*, 128 N.H. 102, 108, 509 A.2d 151 (1986) (go-cart racing); *Kondrad* v. *Bismarck Park District*, 655 N.W.2d 411, 414 (N.D. 2003) (bicycling); *Cain* v. *Cleveland Parachute Training Center*, 9 Ohio App. 3d 27, 28, 457 N.E.2d 1185 (1983) (skydiving); *Manning* v. *Brannon*, 956 P.2d 156, 159 (Okla. App. 1997) (skydiving); *Mann* v. *Wetter*, 100 Or. App. 184, 187–88, 785 P.2d 1064 (1990) (scuba diving); *Kotovsky* v. *Ski Liberty Operating Corp.*, 412 Pa. Super. 442, 448, 603 A.2d 663 (1992) (ski racing); *Huckaby* v. *Confederate Motor Speedway, Inc.*, 276 S.C. 629, 631, 281 S.E.2d 223 (1981) (automobile racing); *Holzer* v. *Dakota Speedway, Inc.*, 610 N.W.2d 787, 798 (S.D. 2000) (automobile racing); *Kellar* v. *Lloyd*, 180 Wis. 2d 162, 183, 509 N.W.2d 87 (App. 1993) (flagperson at automobile race); *Milligan* v. *Big Valley Corp.*, 754 P.2d 1063, 1065 (Wyo. 1988) (ski race during decathlon).[5]

This near unanimity among the courts of the various states reflects the fact that "[m]ost, if not all, recreational activities are voluntary acts. Individuals participate in them for a variety of reasons, including to exercise, to experience a rush of adrenaline, and to

[5] See also *McAtee* v. *Newhall Land & Farming Co.*, 169 Cal. App. 3d 1031, 1034–35, 216 Cal. Rptr. 465 (1985) (motocross racing); *Hulsey* v. *Elsinore Parachute Center*, 168 Cal. App. 3d 333, 343, 214 Cal. Rptr. 194 (1985) (skydiving); *Jones* v. *Dressel*, 623 P.2d 370, 375 (Colo. 1981) (skydiving).

engage their competitive nature. These activities, while surely increasing one's enjoyment of life, cannot be considered so essential as to override the ability of two parties to contract about the allocation of the risks involved in the provision of such activity. When deciding to engage in a recreational activity, participants have the ability to weigh their desire to participate against their willingness to sign a contract containing an exculpatory clause." *Hyson* v. *White Water Mountain Resorts of Connecticut, Inc.*, supra, 265 Conn. 649 (*Norcott, J.*, dissenting). It also is consistent with the view of the American Law Institute, as embodied in 2 Restatement (Second) of Contracts § 195 (1981),[6] and Restatement (Third) of Torts, Apportionment of Liability § 2 (2000).[7]

---

[6] Section 195 of 2 Restatement (Second) of Contracts provides in relevant part: "(2) A term exempting a party from tort liability for harm caused negligently is unenforceable on grounds of public policy if

"(a) the term exempts an employer from liability to an employee for injury in the course of his employment;

"(b) the term exempts one charged with a duty of public service from liability to one to whom that duty is owed for compensation for breach of that duty, or

"(c) the other party is similarly a member of a class protected against the class to which the first party belongs. . . ." 2 Restatement (Second), Contracts § 195, p. 65 (1981).

[7] Restatement (Third), Torts, Apportionment of Liability § 2, p. 19 (2000), provides: "When permitted by contract law, substantive law governing the claim, and applicable rules of construction, a contract between the plaintiff and another person absolving the person from liability for future harm bars the plaintiff's recovery from that person for the harm. Unlike a plaintiff's negligence, a valid contractual limitation on liability does not provide an occasion for the factfinder to assign a percentage of responsibility to any party or other person."

The commentary to § 2 further supports our conclusion in the present case. See id., comment (b), p. 20 ("In appropriate situations, the parties to a transaction should be able to agree which of them should bear the risk of injury, even when the injury is caused by a party's legally culpable conduct. That policy is not altered or undermined by the adoption of comparative responsibility. Consequently, a valid contractual limitation on liability, within its terms, creates an absolute bar to a plaintiff's recovery from the other party to the contract."); see also id., comment (e), p. 21 ("Some contracts for assumption of risk are unenforceable as a matter of public policy. Whether a

Notwithstanding the foregoing authority, the majority adopts the Vermont Supreme Court's holding in *Dalury* v. *S-K-I, Ltd.*, supra, 164 Vt. 334, and concludes that the release agreement in the present case violates public policy. In *Dalury*, the plaintiff "sustained serious injuries when he collided with a metal pole that formed part of the control maze for a ski lift line. Before the season started, [the plaintiff] had purchased a midweek season pass and signed a form releasing the ski area from liability." Id., 330. The release signed by the plaintiff in *Dalury* clearly disclaimed liability for negligence. Id. Citing the *Tunkl* factors, but fashioning an alternative test based on the totality of the circumstances, the *Dalury* court held the release invalid as against public policy. Id., 333–35. The *Dalury* court, like the majority in the present case, concluded that a recreational activity affected the public interest because of the considerable public participation. Id., 334. I find the Vermont court's opinion unpersuasive.

Although the number of tickets sold to the public is instructive in determining whether an agreement affects the public interest, it is by no means dispositive. Private, nonessential industries, while often very popular, wield no indomitable influence over the public. The average person is capable of reading a release agreement and deciding not to snowtube because of the risks that he or she is asked to assume.[8] By contrast, in those fields

contractual limitation on liability is unenforceable depends on the nature of the parties and their relationship to each other, including whether one party is in a position of dependency; the nature of the conduct or service provided by the party seeking exculpation, including whether the conduct or service is laden with 'public interest'; the extent of the exculpation; the economic setting of the transaction; whether the document is a standardized contract of adhesion; and whether the party seeking exculpation was willing to provide greater protection against tortious conduct for a reasonable, additional fee.").

[8] The majority apparently considers snowtubing to be so important that the average consumer would be unable to pass up participation, stating: "Thus, the plaintiff, who traveled to Powder Ridge in anticipation of snowtubing that day, was faced with the dilemma of either signing the defendants'

implicating the public interest, the patron is at a substantial bargaining disadvantage. Few people are in a position to quibble over contractual obligations when seeking, for example, insurance, medical treatment or child care. A general characteristic of fields entangled with the public interest is their indispensability; snowtubing hardly is indispensable. Under the majority's reasoning, nearly any release affects the public interest, no matter how unnecessary or inherently dangerous the underlying activity may be.[9] That position remains the distinct minority view, followed only by the courts of Vermont and Virginia.[10] See *Hiett* v. *Lake Barcroft Community Assn.*, 244 Va. 191, 194, 418 S.E.2d 894 (1992) ("[t]o hold that it was competent for one party to put the other parties to the contract at the mercy of its own misconduct . . . can never be lawfully done where an enlightened system of jurisprudence prevails").

---

proffered waiver of prospective liability or forgoing completely the opportunity to snowtube at Powder Ridge." Because snowtubing, unlike the important societal considerations that other courts have concluded implicate the public interest, is wholly nonessential, I disagree with the majority's position that the mere inconvenience of having to forgo it creates an unacceptable disparity in bargaining power.

[9] Indeed, the majority states: "Voluntary recreational activities, such as snowtubing, skiing, basketball, soccer, football, racquetball, karate, ice skating, swimming, volleyball or yoga are pursued by the vast majority of the population and constitute an important and healthy part of everyday life."

[10] Although New York courts formerly upheld prospective releases from liability; see *Lago* v. *Krollage*, 78 N.Y.2d 95, 100, 575 N.E.2d 107, 571 N.Y.S.2d 689 (1991); that state's legislature superseded many of those precedents with New York Gen. Oblig. Law § 5-326 (McKinney 2001), which provides: "Every covenant, agreement or understanding in or in connection with, or collateral to, any contract, membership application, ticket of admission or similar writing, entered into between the owner or operator of any pool, gymnasium, place of amusement or recreation, or similar establishment and the user of such facilities, pursuant to which such owner or operator receives a fee or other compensation for the use of such facilities, which exempts the said owner or operator from liability for damages caused by or resulting from the negligence of the owner, operator or person in charge of such establishment, or their agents, servants or employees, shall be deemed to be void as against public policy and wholly unenforceable."

The majority also contends that, because of the status of Connecticut negligence law, my conclusion would have broader public policy implications than the decisions of other courts upholding releases. Specifically, the majority contends that because the law of Connecticut does not recognize differing degrees of negligence, my position allows snowtube operators to insulate themselves from liability even for grossly negligent acts. This is a contrast from states that do recognize a separate claim for gross negligence. Thus, the majority avers, in this state, it would be possible to insulate oneself from liability for all acts not rising to the level of recklessness, whereas elsewhere only simple negligence may be disclaimed.

Although the majority's theory initially appears compelling, closer examination reveals that the line it draws is a distinction without a difference because many states that prohibit prospective releases of liability for gross negligence define gross negligence in a way that mirrors Connecticut recklessness law.[11] See Mich. Comp. Laws § 691.1407 (7) (a) (2005) (governmental immunity statute defining gross negligence as "conduct so reckless as to demonstrate a substantial lack of concern for whether an injury results"); see also *Williams* v. *Thude*, 188 Ariz. 257, 259, 934 P.2d 1349 (1997) ("[W]anton misconduct is aggravated negligence. . . .

---

[11] Recklessness entails "something more than a failure to exercise a reasonable degree of watchfulness to avoid danger to others or to take reasonable precautions to avoid injury to them. . . . Wanton misconduct is reckless misconduct. . . . It is such conduct as indicates a reckless disregard of the just rights or safety of others or of the consequences of the action. . . . [W]illful, wanton, or reckless conduct tends to take on the aspect of highly unreasonable conduct, involving an extreme departure from ordinary care, in a situation where a high degree of danger is apparent. . . . It is at least clear . . . that such aggravated negligence must be more than any mere mistake resulting from inexperience, excitement, or confusion, and more than mere thoughtlessness or inadvertence, or simply inattention." (Internal quotation marks omitted.) *Frillici* v. *Westport*, 264 Conn. 266, 277–78, 823 A.2d 1172 (2003).

[W]illful, wanton, and reckless conduct have commonly been grouped together as an aggravated form of negligence." [Citations omitted; internal quotation marks omitted.]); *Cullison* v. *Peoria*, 120 Ariz. 165, 169, 584 P.2d 1156 (1978) ("[W]anton [or gross] negligence is highly potent, and when it is present it fairly proclaims itself in no uncertain terms. It is in the air, so to speak. It is flagrant and evinces a lawless and destructive spirit." [Internal quotation marks omitted.]); *Ziarko* v. *Soo Line R. Co.*, 161 Ill. 2d 267, 274–75, 641 N.E.2d 402 (1994) ("[U]nlike intentionally tortious behavior, conduct characterized as willful and wanton may be proven where the acts have been less than intentional—i.e., where there has been a failure, after knowledge of impending danger, to exercise ordinary care to prevent the danger, or a failure to discover the danger through . . . carelessness when it could have been discovered by the exercise of ordinary care. . . . Our case law has sometimes used interchangeably the terms willful and wanton negligence, gross negligence, and willful and wanton conduct. . . . This court has previously observed that there is a thin line between simple negligence and willful and wanton acts . . . ." [Citations omitted; internal quotation marks omitted.]); *Murphy* v. *Edmonds*, 325 Md. 342, 375, 601 A.2d 102 (1992) ("gross negligence . . . has been defined in motor vehicle tort cases as a wanton or reckless disregard for human life in the operation of a motor vehicle" [internal quotation marks omitted]); *Stringer* v. *Minnesota Vikings Football Club*, 686 N.W.2d 545, 552–53 (Minn. App. 2004) ("Gross negligence is substantially and appreciably higher in magnitude than ordinary negligence. It is materially more want of care than constitutes simple inadvertence. It is an act or omission respecting legal duty of an aggravated character as distinguished from a mere failure to exercise ordinary care. It is very great negligence, or the absence of slight diligence, or the

want of even scant care. It amounts to indifference to present legal duty, and to utter forgetfulness of legal obligations so far as other persons may be affected. It is a heedless and palpable violation of legal duty respecting the rights of others." [Internal quotation marks omitted.]), review granted, 2004 Minn. LEXIS 752 (November 23, 2004), quoting *State* v. *Bolsinger*, 221 Minn. 154, 159, 21 N.W.2d 480 (1946); *State* v. *Chambers*, 589 N.W.2d 466, 478–79 (Minn. 1999) (person is grossly negligent when he acts "without even scant care but not with such reckless disregard of probable consequences as is equivalent to a willful and intentional wrong" [internal quotation marks omitted]), quoting *State* v. *Bolsinger*, supra, 159; *Bennett* v. *Labenz*, 265 Neb. 750, 755, 659 N.W.2d 339 (2003) ("[g]ross negligence is great or excessive negligence, which indicates the absence of even slight care in the performance of a duty"); *New Light Co.* v. *Wells Fargo Alarm Services*, 247 Neb. 57, 64, 525 N.W.2d 25 (1994) (relying on New York law characterizing gross negligence as "conduct that evinces a reckless indifference to the rights of others"); *Sommer* v. *Federal Signal Corp.*, 79 N.Y.2d 540, 554, 593 N.E.2d 1365, 583 N.Y.S.2d 957 (1992) ("Gross negligence, when invoked to pierce an agreed-upon limitation of liability in a commercial contract, must smack of intentional wrongdoing. . . . It is conduct that evinces a reckless indifference to the rights of others." [Citations omitted; internal quotation marks omitted.]); *Wishnatsky* v. *Bergquist*, 550 N.W.2d 394, 403 (N.D. 1996) ("[Where] [g]ross negligence is defined [by statute] as the want of slight care and diligence. . . . This court has construed gross negligence to mean no care at all, or the omission of such care which even the most inattentive and thoughtless seldom fail to make their concern, evincing a reckless temperament and lack of care, practically willful in its nature." [Citation omitted; internal quotation marks omitted.]);

*Harsh* v. *Lorain County Speedway, Inc.*, 111 Ohio App. 3d 113, 118–19, 675 N.E.2d 885 (1996) (upholding release for negligence but not "willful and wanton conduct");[12] *Bogue* v. *McKibben*, 278 Or. 483, 486, 564 P.2d 1031 (1977) ("[g]ross negligence refers to negligence which is materially greater than the mere absence of reasonable care under the circumstances, and which is characterized by conscious indifference to or reckless disregard of the rights of others" [internal quotation marks omitted]); *Albright* v. *Abington Memorial Hospital*, 548 Pa. 268, 278, 696 A.2d 1159 (1997) (Pennsylvania Supreme Court approved a trial court's characterization of gross negligence for purposes of governmental immunity statute as "a form of negligence where the facts support substantially more than ordinary carelessness, inadvertence, laxity, or indifference. The behavior of the defendant must be flagrant, grossly deviating from the ordinary standard of care."); *Jinks* v. *Richland County*, 355 S.C. 341, 345, 585 S.E.2d 281 (2003) (For the purposes of a governmental immunity statute, gross negligence is defined as "the intentional conscious failure to do something which it is incumbent upon one to do or the doing of a thing intentionally that one ought not to do. . . . It is the failure to exercise slight care. . . . Gross negligence has also been defined as a relative term and means the absence of care that is necessary under the circumstances." [Citations omitted.]).[13]

---

[12] The Ohio Supreme Court has equated willful and wanton conduct with recklessness as that term is defined in the Restatement Second of Torts, stating: "The actor's conduct is in reckless disregard of the safety of others if he does an act or intentionally fails to do an act which it is his duty to the other to do, knowing or having reason to know of facts which would lead a reasonable man to realize, not only that his conduct creates an unreasonable risk of physical harm to another, but also that such risk is substantially greater than that which is necessary to make his conduct negligent." (Internal quotation marks omitted.) *Thompson* v. *McNeill*, 53 Ohio St. 3d 102, 104–105, 559 N.E.2d 705 (1990), quoting 2 Restatement (Second), Torts § 500, p. 587 (1965).

[13] Other states do, however, characterize gross negligence as more serious than ordinary negligence, while not rising to the level of recklessness. See *Calvillo-Silva* v. *Home Grocery*, 19 Cal. 4th 714, 968 P.2d 65, 80 Cal. Rptr.

Furthermore, at least one other court has concluded that releases similar to the one in question are valid notwithstanding the absence of a gross negligence doctrine. New Hampshire, like Connecticut, does not recognize differing degrees of negligence, yet its highest court has upheld a release of liability for negligence, stating: "The plaintiff cites a number of cases from other jurisdictions that hold on public policy grounds that an exculpatory agreement does not release defendants from liability for gross negligence. These cases are inapposite because New Hampshire law does not distinguish causes of action based on ordinary and gross negligence. . . . The plaintiff advances no reasons for abandoning this rule and we decline to create an exception to allow him to pursue his claims of gross negligence." (Citation omitted.) *Barnes* v. *New Hampshire Karting Assn., Inc.*, supra, 128 N.H. 108–109; but see *Ratti* v. *Wheeling Pittsburgh Steel Corp.*, 758 A.2d 695, 705 n.3 (Pa. Super. 2000) (declining to reach issue of whether agreement that released liability for gross negligence would violate public policy where agreement in question stated only "negligence"); *Bielski* v. *Schulze*, 16 Wis. 2d 1, 18–19, 114 N.W.2d 105 (1962) (recognizing potential problems that Wisconsin's abolition of gross negligence might raise in area of exculpatory clauses).

---

2d 506 (1998) (characterizing willful and wanton conduct as more serious than gross negligence), overruled on other grounds by *Aguilar* v. *Atlantic Richfield Co.*, 25 Cal. 4th 826, 854, 24 P.3d 493, 107 Cal. Rptr. 2d 841 (2001); *Travelers Indemnity Co.* v. *PCR, Inc.*, 889 So. 2d 779, 793 n.17 (Fla. 2004) (defining " 'culpable negligence' as 'reckless indifference' or 'grossly careless disregard' of human life" and gross negligence as "an act or omission that a reasonable, prudent person would know is likely to result in injury to another"); *Altman* v. *Aronson*, 231 Mass. 588, 592, 121 N.E. 505 (1919) (defining gross negligence as less serious than recklessness); *Parret* v. *Unicco Service Co.*, 127 P.3d 572, 575–76 (Okla. 2005) (same); *Weaver* v. *Mitchell*, 715 P.2d 1361, 1369–70 (Wyo. 1986) (punitive damages cannot be awarded for gross negligence, which is less serious than reckless or wanton conduct). Despite these decisions, I am not persuaded that our conclusion provides inadequate protection to snowtube patrons.

The great weight of these numerous and highly persuasive authorities compels my conclusion that the release at issue herein does not violate public policy as it pertains to the sport of snowtubing. Accordingly, I conclude that the trial court properly granted summary judgment in the defendants' favor and I would affirm that judgment. I, therefore, respectfully dissent.