******************************************

The "officially released" date that appears near the beginning of each opinion is the date the opinion will be published in the Connecticut Law Journal or the date it was released as a slip opinion. The operative date for the beginning of all time periods for filing postopinion motions and petitions for certification is the "officially released" date appearing in the opinion.

All opinions are subject to modification and technical correction prior to official publication in the Connecticut Reports and Connecticut Appellate Reports. In the event of discrepancies between the advance release version of an opinion and the latest version appearing in the Connecticut Law Journal and subsequently in the Connecticut Reports or Connecticut Appellate Reports, the latest version is to be considered authoritative.

The syllabus and procedural history accompanying the opinion as it appears in the Connecticut Law Journal and bound volumes of official reports are copyrighted by the Secretary of the State, State of Connecticut, and may not be reproduced and distributed without the express written permission of the Commission on Official Legal Publications, Judicial Branch, State of Connecticut.
******************************************

DANIEL KLEIN *v.* QUINNIPIAC UNIVERSITY
(AC 41964)

Lavine, Keller and Bishop, Js.

*Syllabus*

The plaintiff sought to recover damages from the defendant private university for negligence in connection with personal injuries he sustained when, while riding his bicycle on the defendant's campus, he hit a speed bump and was thrown over the bicycle's handlebars. The plaintiff alleged that the speed bump was a dangerous, defective and unsafe condition on the defendant's property and that his injuries resulted from the defendant's negligence. The defendant denied any negligence and raised as a special defense that the plaintiff was contributorily negligent. Following a trial, the jury returned a general verdict in favor of the defendant, but no interrogatories were submitted to it. The trial court rendered judgment in accordance with the verdict, and the plaintiff appealed to this court. *Held*:

1. The plaintiff could not prevail on his claim that the trial court erred by declining to instruct the jury on the definition of, and the duty owed to, a licensee: the evidence in the record did not reasonably support a conclusion that the plaintiff was a licensee, as there was no evidence that the defendant explicitly or implicitly expressed a desire that the plaintiff enter its campus or a willingness that he do so, and, contrary to the plaintiff's contention that the defendant impliedly gave him consent to ride his bicycle on the campus because there was a lack of "no trespassing" signs and no gate or the like at each entrance to the campus, the lack of such signs or a gate at each entrance, without some additional evidence demonstrating implied consent, was insufficient to send the question of whether the plaintiff was a licensee to the jury, and if this court were to adopted the plaintiff's reasoning and permit liability to be imposed in situations such as these, it essentially would require many private properties in the state that are now used for recreational purposes, to be fenced, gated and covered with "no trespassing" signs to bar access by the public, which would have significant societal impact and concomitant cost; moreover, even if this court were to assume that the plaintiff was a licensee, the evidence did not support a finding that the defendant breached any duty to the plaintiff as a licensee because, under the circumstances in this case, the defendant was not required to warn the plaintiff of the obvious dangers of his actions, namely, riding his bicycle over a speed bump as he proceeded down a hill with no intention of obeying the stop sign that lay just beyond the speed bump.

2. The general verdict rule precluded review of the plaintiff's claim that the trial court improperly permitted a certain witness to testify concerning the estimated speed of the plaintiff's bicycle at the time of the accident; because the general verdict rule applied, this court was required to presume that the jury found every issue in favor of the defendant, including that the defendant was not negligent, and, therefore, that rule precluded review of the plaintiff's remaining evidentiary claim, which related only to the defendant's special defense of contributory negligence.

(*One judge dissenting*)

Argued May 16—officially released October 8, 2019

*Procedural History*

Action to recover damages for the defendant's alleged negligence, and for other relief, brought to the Superior Court in the judicial district of New Haven, and tried to the jury before, *Wahla, J.*; verdict and judgment for the defendant, from which the plaintiff appealed to this court. *Affirmed*.

*Steven D. Jacobs*, with whom, on the brief, was *Rich-*

*ard L. Jacobs*, for the appellant (plaintiff).

*James E. Wildes*, for the appellee (defendant).

*Opinion*

LAVINE, J. In this premises liability action, the plaintiff, Daniel Klein, appeals from the judgment of the trial court, rendered after a jury trial, in favor of the defendant, Quinnipiac University. On appeal, the plaintiff claims that the trial court erred by (1) permitting a witness to testify about the estimated speed of the plaintiff's bicycle at the time of his collision, and (2) refusing to give a jury instruction on the definition of, and the duty owed to, a licensee. For the reasons discussed herein, we affirm the judgment of the trial court.

The jury reasonably could have found the following facts. The weather was clear and sunny on July 30, 2014, and the plaintiff, who was then seventy-one years old, and his friend, Richard Lebov, decided to take a bike ride through the defendant's campus because the "hill" offered a "difficult climb" that was "fun" and "a challenge." The two had ridden their bicycles there the year before. They were not students at the defendant, employed at the defendant, invited onto the campus, or planning to meet anyone on the campus.[1] The campus was not gated, and there were no "no trespassing" signs. Upon entering the campus, there were alternative routes available, one of which would pass by a guardhouse where a public safety officer was stationed at all times.[2] There was a sign posted on the guardhouse directing vehicles to check in.[3]

The plaintiff and Lebov took the road to the right that avoided the guardhouse and rode to the top of the hill.[4] They rode down the hill on a road that passes near the guardhouse. At the end of the road, there were two bright yellow speed bumps and a stop sign. There was nothing that obstructed the plaintiff's, or Lebov's, view of the speed bumps and the stop sign—especially as it was a clear and sunny day. Both of them saw the bright yellow speed bumps clearly.[5]

At trial, the plaintiff and Lebov each testified that they had no intention of stopping at the stop sign.[6] They both rode over the first speed bump without incident. When the plaintiff's bicycle made contact with the second speed bump, he flew over the top of his handlebars, hit the ground, and sustained serious injuries. The officer stationed at the guardhouse, Juan Melendez, called dispatch, and the plaintiff received medical assistance.

Officer Melendez had seen the plaintiff and Lebov ride up the hill and had left the guardhouse to survey the area because he thought that they were still in the general area.[7] He turned when he heard a noise and saw the tire of the plaintiff's bicycle hit the second speed bump and the plaintiff thrown over the handlebars. Officer Melendez was permitted, over objection, to testify that the plaintiff's speed was "conservatively ten miles an hour" or faster because of the hill's incline.

The plaintiff brought the present action, seeking mon-

etary damages, claiming that the speed bump was dangerous, defective, and unsafe and that his injuries resulted from the defendant's negligence. The defendant denied any negligence and raised the special defense that the plaintiff was contributorily negligent. The case was tried to a jury, but no interrogatories were submitted to it. Following the trial, the jury returned a general verdict in favor of the defendant, and the court rendered judgment accordingly. This appeal followed.

The plaintiff first challenges the court's evidentiary ruling permitting Officer Melendez to estimate the speed of the plaintiff's bicycle. Second, he claims that the court improperly refused to instruct the jury that his status could have been that of a licensee and erred by charging the jury only on his status as a trespasser.[8] The defendant, however, argues that the general verdict rule applies to this case and precludes a review of the plaintiff's contentions on appeal. The plaintiff argues that although the general verdict rule might insulate the verdict from attack in other circumstances, it does not do so in the present case because the improper jury charge affected both the negligence claim and the contributory negligence special defense. We view the plaintiff's second claim of error with respect to the jury charge to be without merit, and we conclude that the general verdict rule applies to defeat the plaintiff's first claim. We address the plaintiff's second claim first.

The essential issue in this case is whether the plaintiff, an experienced bicyclist, who was injured while riding his bicycle on the York Hill campus of the defendant, a private university, was entitled to have the jury instructed on the definition of, and the duty owed to, a licensee. The trial court decided that the issue was one of law, that the evidence did not support the claim that the plaintiff was a licensee, and that he was not entitled to such a jury charge. On appeal, the plaintiff claims that it was reversible error for the court to take the issue away from the jury, which returned a verdict in favor of the defendant, because, in his view, there was evidence that the defendant implicitly consented to his presence.

Connecticut's premises liability law has long provided that "[t]he status of an entrant on another's land, be it trespasser, licensee or invitee, determines the duty that is owed to the entrant while he or she is on a landowner's property." (Internal quotation marks omitted.) *Cuozzo* v. *Orange*, 178 Conn. App. 647, 655, 176 A.3d 586 (2017), cert. denied, 328 Conn. 906, 177 A.3d 1159 (2018). "Ordinarily, the status of one who sustains injury while upon the property of another is a question of fact." (Internal quotation marks omitted.) *Moonan* v. *Clark Wellpoint Corp.*, 159 Conn. 178, 185, 268 A.2d 384 (1970); see also *Roberts* v. *Rosenblatt*, 146 Conn. 110, 112, 148 A.2d 142 (1959). "Where, however, the facts essential to the determination of the plaintiff's

status are not in dispute, a legal question is presented." (Internal quotation marks omitted.) *Gargano* v. *Azpiri*, 110 Conn. App. 502, 506, 955 A.2d 593 (2008); see also *Brown* v. *Robishaw*, 282 Conn. 628, 633, 922 A.2d 1086 (2007) ("[i]f . . . the evidence would not reasonably support a finding of the particular issue, the trial court has a duty not to submit it to the jury" [internal quotation marks omitted]).

The plaintiff argues that he asked the court to charge the jury on the definition of and the duty owed to a licensee. He cites in his appellate brief to a proposed jury instruction that states: "A licensee is a person who is privileged to enter or remain on land only by virtue of the possessor's consent, that is, with the possessor's permission or with the possessor's express or *implied consent*." (Emphasis in original.) See Connecticut Civil Jury Instructions 3.9-3, available at http://www.jud.ct.-gov/JI/Civil/Civil.pdf (last visited October 3, 2019).[9] He argues that the "evidence reasonably supported a finding that [he], while on the defendant's property on July 30, 2014, was there, if not with the possessor's express consent, then with its implied consent . . . ."

While the civil jury instruction cited to by the plaintiff contains the phrases "express consent" and "implied consent," those precise phrases do not appear in our case law discussing the classification of someone entering onto someone else's land. Rather, our Supreme Court, guided by § 330 of the Restatement (First) of Torts, has defined a licensee as "a person who is privileged to enter or remain upon land by virtue of the possessor's consent, whether given by *invitation* or *permission*." (Emphasis added; internal quotation marks omitted.) *Laube* v. *Stevenson*, 137 Conn. 469, 473, 78 A.2d 693 (1951); see also *Salaman* v. *Waterbury*, 246 Conn. 298, 305, 717 A.2d 161 (1998) (same).

Although our Supreme Court has made clear that licensee status can be established by demonstrating that the possessor of the land gave someone permission or an invitation to enter the property, only a few cases following our Supreme Court's adoption of the licensee definition discuss such status, and they shed little light on precisely what a plaintiff entrant is required to show in order to establish that it received the requisite consent.

For example, in *Salaman* v. *Waterbury*, supra, 246 Conn. 301, an administrator of a swimmer's estate brought an action against the defendant city for premises liability negligence, after the swimmer drowned while swimming across a reservoir owned by the city. The jury returned a verdict in favor of the plaintiff, but the court ultimately granted the city's motion to set aside the verdict and for judgment notwithstanding the verdict, concluding that there was insufficient evidence to impose either trespasser or licensee liability. Id., 303. This court disagreed and reversed the trial court's

judgment. Id. Our Supreme Court then granted certification to appeal. Id., 304. After defining "licensee," the court went on to note that "[i]n order to prove that the decedent was a licensee, the plaintiff was required to prove that the decedent was on the city's land with its permission or by its express or implied invitation."[10] Id., 306.

In construing this statement by our Supreme Court, it is unclear whether licensee status can also be established by implied permission. One could argue that the absence of the phrase "express or implied" before the word "permission" suggests that the court intended to preclude proof of licensee status by implied permission. One could also argue that our Supreme Court's use of the phrase "implied invitation" was intended to be interchangeable with "implied permission." The court in *Salaman*, however, did not reach the issue of whether the swimmer was in fact a licensee or provide any further analysis on his status. The court concluded that it need not examine the record to determine if there was some evidence from which the jury reasonably might have concluded that the decedent was a licensee because, even if it assumed that the decedent was a licensee, the evidence did not support a finding that the city breached any duty to the decedent as a licensee. Id, 306.

Older case law, however, suggests that implied permission may be sufficient to establish licensee status. For example, in *Katsonas* v. *Sutherland Building & Contracting Co.*, 104 Conn. 54, 132 A. 553 (1926), which was decided prior to our Supreme Court's adoption of its current licensee definition, stated that "when a landowner tacitly permits certain acts upon his property, a license to do these acts may be inferred from his failure to object . . . ."

In an attempt to clarify this ambiguity and determine what proof is permissible to establish licensee status, we turn our attention to the comments of § 330 of the Restatement (First) of Torts, the section from which our Supreme Court adopted the licensee definition. Comment (a) to that section states: " 'Invitation' and 'permission.' An invitation differs from a permission only in this: an invitation is conduct which justifies others in believing that the possessor desires them to enter; a permission is conduct justifying others in believing that the possessor is willing that they shall enter if they desire to do so. It is immaterial whether the consent which creates the license is an invitation originating with the possessor of the land or by a permission given upon request made by the licensee. The important fact is that the entry is by the consent of the possessor and it is immaterial that the suggestion of the visit originates with him or with his licensee." 2 Restatement (First), Torts § 330, comment (a), p. 893 (1934).

Furthermore, comment (b) to § 330 of the Restatement (First) of Torts states: " 'Toleration' and 'permission.' The word 'permission' indicates that the possessor's conduct is such as to give others reason to believe that he consents to their entering the land if they desire to do so. A mere failure to object to another's entry may be a sufficient manifestation of consent thereto if the possessor knows of the other's intention to enter and has reason to believe that his objection is likely to be effective in preventing the other from entering. On the other hand, the fact that the possessor knows of the other's intention to enter and does not prevent it may not be of itself a sufficient manifestation of consent and, therefore, is not necessarily permission. A failure to take burdensome and expensive precautions against intrusion manifests an unwillingness to go to the trouble and expense of preventing others from trespassing upon the land and expresses toleration of the practically unavoidable rather than consent to their entry as licensees. *Even a failure to post a notice warning the public not to trespass cannot reasonably be construed as an expression of consent* to the intrusions of persons who habitually and notoriously disregard such notices." (Emphasis added.) Id., comment (b), p. 893–94.

Additionally, comment (d) to § 330 of the Restatement (First) of Torts states in relevant part: "License created otherwise than by words. The consent which is necessary to confer a license to enter land, may be expressed by acts other than words. Here again the decisive factor is the interpretation which a reasonable man would put upon the possessor's acts." Id., comment (d), p. 894.

In light of the guidance provided in the comments to § 330 of the Restatement (First) of Torts, and in light of the myriad cases from other jurisdictions recognizing that both express and implied permission is sufficient to render an entrant a licensee; see, e.g., *Fitzsimmons v. State*, 42 App. Div. 2d 636, 637, 345 N.Y.S.2d 171 (1973) ("[a] licensee is one who enters the premises for his own benefit without invitation, but with permission, express or implied, of the owner or person in possession"), aff'd, 34 N.Y.2d 739, 313 N.E.2d 790, 357 N.Y.S.2d 498 (1974); we are assuming, arguendo, that express or implied permission, in addition to an express or implied invitation, if established, can render an entrant a licensee.

In the present case, we must determine if the court properly concluded, as a matter of law, that the evidence did not reasonably support a finding that the plaintiff was a licensee. See *Gargano* v. *Azpiri*, supra, 110 Conn. App. 506 ("[w]here . . . the facts essential to the determination of the plaintiff's status are not in dispute, a legal question is presented" [internal quotation marks omitted]).

We conclude that the essential facts in the present case are not in dispute, and, thus, the determination of the plaintiff's status is a question of law. The essential facts are as follows: The plaintiff is an avid bicyclist; he entered the private campus of the defendant on his bicycle; he did not stop at the clearly visible guardhouse located near the two main roads accessing the buildings on campus, but took the road that avoided it by riding to the right of it; there were no "no trespassing" signs present; there were not gates at every entrance to the campus; the plaintiff was not employed by the defendant at the time of the accident; he was not a student or a parent of a student attending the university; he had no other purpose for being on campus other than his desire to continue his bike ride through the campus, which he had done one previous time a year earlier; and there was no evidence that the defendant knew of the plaintiff's prior bike ride on the campus a year earlier.

On the basis of the record before us, we have little difficulty concluding that the court properly declined to give the jury a licensee instruction. The evidence in the present case did not reasonably support a conclusion that the plaintiff was a licensee—that is, that he received an express or implied invitation or express or implied permission to enter the campus. Indeed, there was no evidence of the defendant's having explicitly or implicitly expressed a desire that the plaintiff enter its campus, nor was there any evidence of the defendant's having expressed a willingness that he do so. See 2 Restatement (First), supra, § 330, comment (a), p. 893.

The plaintiff primarily argues that the defendant impliedly gave him consent to ride his bicycle on the campus because there was a lack of "no trespassing" signs and no gate or the like at each and every entrance to the campus. The lack of "no trespassing" signs or a gate at each entrance, however, without some additional evidence demonstrating implied consent, is insufficient to send the question of whether the plaintiff was a licensee to the jury. See 2 Restatement (First), supra, § 330, comment (b), p. 894 ("[e]ven a failure to post a notice warning the public not to trespass cannot reasonably be construed as an expression of consent"). Put another way, there is insufficient evidence in the record before us demonstrating that the defendant's conduct, either expressly or implicitly, made others believe that the defendant was willing to let them enter the campus if they desired to do so. If we were to adopt the plaintiff's reasoning and permit liability to be imposed in situations such as these, "no trespassing" signs will go up, along with fences and gates, barring access to many private properties now used for recreational purposes, creating closed enclaves throughout our state. The societal impact, and concomitant cost, of such a ruling would be significant. See, e.g., *Salaman* v. *Waterbury*,

supra, 246 Conn. 307 ("A rule requiring a property owner to post warning signs about the dangers inherent in swimming is unreasonable. In Connecticut, a small state, hundreds of miles of shoreline would be exposed to this unreasonable requirement. Property owners who have water on their land are entitled to assume that a reasonable adult would be aware of the risk of drowning in a body of water.") We, therefore, conclude that the court did not err in declining to instruct the jury on licensee status and its corresponding duty of care.[11]

Moreover, even if we were to assume that the plaintiff in this case was a licensee, we would be unable to conclude that the evidence supports a finding that the defendant breached any duty to the plaintiff as a licensee. See *Salaman* v. *Waterbury*, supra, 246 Conn. 306. "The duty that a . . . [landowner] owes to a licensee . . . does not ordinarily encompass the responsibility to keep the property in a reasonably safe condition, because the licensee must take the premises as he [or she] finds them. . . . If the licensor actually or constructively knows of the licensee's presence on the premises, however, the licensor must use reasonable care both to refrain from actively subjecting him [or her] to danger and to warn him [or her] of dangerous conditions which the possessor knows of but which he [or she] cannot reasonably assume that the licensee knows of or by reasonable use of his [or her] faculties would observe." (Citations omitted; internal quotation marks omitted.) *Morin* v. *Bell Court Condominium Assn.*, *Inc.*, 223 Conn. 323, 327, 612 A.2d 1197 (1992).

The plaintiff would have been required to establish that the defendant breached the duty owed to a licensee. On the basis of our review of the evidence, no jury reasonably could have concluded that the defendant breached that duty even if one assumes the plaintiff was a licensee. In particular, there was no claim or evidence to support a finding that the defendant actively subjected the plaintiff to danger. Thus, the defendant's duty to the plaintiff, had he in fact been a licensee, would be to "warn him [or her] of dangerous conditions which the possessor knows of but which he [or she] cannot reasonably assume that the licensee knows of or by reasonable use of his [or her] faculties would observe." (Internal quotation marks omitted.) Id., 329.

We are simply unwilling to conclude that on a sunny and clear day, a plainly visible bright yellow speed bump located on a paved road, even if on a hill, can be considered a hidden, dangerous condition. In fact, there was testimony that speed bumps "are a known hazard to bicyclists." Moreover, there was no evidence before the jury demonstrating that the defendant was aware of this alleged defect. In particular, there was no evidence that the defendant was aware that the way that the speed bump was constructed rendered the premises unsafe. Here, under the circumstances of this case, the

plaintiff should have been aware of the dangers of riding his bicycle over a speed bump as he proceeded down the hill with no intention of obeying the stop sign that lay just beyond the speed bumps. See, e.g., *Hanks* v. *Powder Ridge Restaurant Corp.*, 276 Conn. 314, 336 n.12, 885 A.2d 734 (2005) ("[t]he risks inherent in each type of recreational activity will necessarily vary, and it is common knowledge that some recreational activities are inherently more dangerous than others"); see also *Rivera* v. *Glen Oaks Village Owners, Inc.*, 41 App. Div. 3d 817, 820, 839 N.Y.S.2d 183 (2007) ("[b]y engaging in a sport or recreational activity, a participant consents to those commonly-appreciated risks which are inherent in and arise out of the nature of the sport generally and flow from such participation") Even if we had assumed the plaintiff was a licensee, we would conclude on the facts of the present case that the defendant was not required to warn the plaintiff of the obvious dangers of his actions.

Lastly, we conclude that the general verdict rule applies to defeat the plaintiff's remaining claim that the court improperly permitted Officer Melendez to estimate the speed of the plaintiff's bicycle. "[The general verdict] rule operates . . . to insulate a verdict that may have been reached under a cloud of error, but which also could have been reached by an untainted route." *Dowling* v. *Finley Associates, Inc.*, supra, 248 Conn. 376. "[It] applies whenever a verdict for one party could reasonably have been rendered on one or more distinct causes of action or distinct defenses. . . . [A] defendant['s] denial of negligence and . . . allegations of contributory negligence constitute two discrete defenses, either of which could [support a] jury's general verdict. . . . The verdict [could be] predicated on the defendant['s] freedom from negligence or on the plaintiff's comparatively greater negligence. . . . In light of [a] plaintiff's failure to request interrogatories to ascertain the basis of the jury's verdict, [the verdict] must [be] uph[eld] . . . under the general verdict rule, if either defense is legally supportable. . . . Further, if the trial court's instructions to the jury are shown to be proper and adequate as to any of the defenses raised, the general verdict must stand, regardless of error, if any, in the charge as to any other defense."[12] (Citations omitted.) *Staudinger* v. *Barrett*, 208 Conn. 94, 99–100, 544 A.2d 164 (1988).

Because the general verdict rule applies, we must presume that the jury found every issue in favor of the defendant. We, therefore, conclude that the jury found that the defendant was not negligent. The plaintiff's remaining evidentiary claim, that the court improperly permitted Officer Melendez to estimate the speed of the plaintiff's bicycle, relates only to the contributory negligence special defense. As such, it is precluded by the general verdict rule; see *Segale* v. *O'Connor*, 91 Conn. App. 674, 680, 881 A2d 1048 (2005); and does not

require further discussion.

The judgment is affirmed.

In this opinion KELLER, J., concurred.

[1] The plaintiff gave the following testimony:

"Q. And on the day of the accident, no one invited you to go onto the campus, is that fair to say?

"A. Correct.

"Q. And no one gave you permission to enter the campus?

"A. Correct.

"Q. You just decided to go up the hill and go onto the campus?

"A. Correct.

"Q. And you never worked there?

"A. Correct.

"Q. You weren't a student there?

"A. Correct.

"Q. You were never a student there?

"A. Never.

"Q. You didn't know anybody who worked there?

"A. Correct.

"Q. So, your sole purpose of going onto the campus that day was just to go for a bike ride?

"A. Correct.

"Q. And [the defendant] is a private university, is that so?

"A. Yes.

"Q. All right. So, you went onto private property to go for your bike ride?

"A. Correct."

[2] In our view, the dissent places too much weight on Officer Juan Melendez' following testimony in support of its argument that "visitors without any affiliation with the defendant were generally permitted [on campus] unless they appeared suspicious":

"Q. . . . [I]t's within the—and that person is not affiliated with the university, it's within the discretion of the officer then on duty to let that person up; is it not?

"A. Yes, it is.

"Q. And is it fair to say that unless that person appears to be suspicious in some way that you, as the guard at the guardhouse, would be inclined to exercise your discretion to let that person up.

"A. Yes."

Notably, Officer Melendez additionally testified to the following:

"Q. When you were assigned to the [defendant's] York Hill campus in the guardhouse, what were your—what were your responsibilities?

"A. My responsibilities when I was assigned there was to man that gate, stop traffic, make sure—ask for [identification cards], determine who was coming on campus and what are their nature; what are they there for. One of the reasons they have us ask for student [identification cards] is because we would have people that may want to come on campus that are not students or affiliated with the [defendant], and we do not want to have people that do not belong there there. Because if something happens there could—hurt somebody or do something that they're not, you know, of criminal intent. So, that's why they have us there.

"Q. Is [the defendant] a private university?

"A. It's private.

"Q. And the property of York Hill campus that's private property?

"A. That's a private property. . . .

"Q. Back on July 30, 2014, what was the practice and procedure of guards, such as yourself, public safety officers, if someone had stopped at the guardhouse going up the York Hill campus?

"A. You would ask in—you would ask them for their information, their [identification card], and their business there. If they were a student, faculty, staff, and—you would let them go because they would have a decal on their vehicle."

[3] The dissent's supposition that "the only apparent purpose of the guardhouse was to limit vehicular access" is not supported by the record. The testimony on the issue from Officer Melendez was that "[t]he reason there's a guardhouse is for security reasons. [The defendant has] a student population that [it is] responsible for." Likewise, Barbara Barbuito, the assistant director of facilities for the defendant's York Hill campus, testified as follows:

"Q. Why is there a guardhouse in that location?

"A. There's a guardhouse there so no one enters, other than faculty,

students, and student parents, and our staff. . . .

"Q. I mean security, are—are you concerned about the security of the students, their safety at campus?

"A. Yes.

"Q. Is that—could you tell us whether or not that's a reason why there's a guardhouse there?

"A. That is the reason why there's a guardhouse, so, there's only specific people that are allowed past that guardhouse. . . .

"Q. Is the guardhouse occupied?

"A. Yes.

"Q. And who occupies the guardhouse?

"A. Public safety.

"Q. And how often does public safety occupy the guardhouse?

"A. 24/7.

"Q. Does that include the summer time?

"A. Yes.

"Q. And on July 30, 2014, was the guardhouse—did the guardhouse have somebody in it?

"A. Yes.

"Q. Why was there somebody in the guardhouse?

"A. For safety.

"Q. What are the responsibilities of a public safety officer of [the defendant] who's assigned to that guardhouse?

"A. So, he is not to allow anyone, other than a student, staff member, faculty, or a parent up in the area where the dorms are located. . . .

"Q. Could you tell us whether or not it's the responsibility of who's ever assigned to the guardhouse to stop people from entering that area of campus? . . .

"A. Yes.

"Q. Is [the defendant] a private or public university?

"A. Private.

"Q. And is the York Hill campus part of the [defendant]?

"A. Yes.

"Q. Is that private or public?"

"A. Private.

"Q. Does [the defendant] have a policy regarding individuals who come onto the campus who are not students, faculty, staff?

"A. I believe it's a verbal policy that no one is allowed in the areas where the student dorms are.

"Q. And was that policy in place on July 30, 2014?

"A. Yes.

"Q. If someone rode up on a bicycle to the open campus where the guardhouse [was] back on July 30, 2014, what was the procedure that was in place at the time for public safety?

"A. They would stop them, and ask for [identification], and ask them what they were doing on campus.

"Q. And, again, why would they do that?

"A. For the safety of the students."

[4] The plaintiff testified to the following on cross-examination:

"Q. Exactly. So, rather than go up to the guardhouse to check in at the guardhouse, you took a right?

"A. Correct.

"Q. You didn't see what the sign said?

"A. Correct.

"Q. Because you avoided the guardhouse by going to the right?

"A. Correct.

"Q. So, obviously, you didn't stop at the guardhouse and check in?

"A. Correct."

On redirect examination the plaintiff testified to the following:

"Q. Did you purposely avoid the guardhouse?

"A. No, I came down by the guardhouse."

[5] The plaintiff gave the following testimony:

"Q. And you saw these speed bumps as you were going down the hill?

"A. Correct.

"Q. And the speed bumps were yellow?

"A. Correct.

"Q. And they were bright yellow?

"A. Yes.

"Q. Yes? And you had no difficulty seeing them?

"A. No."

[6] The plaintiff gave the following testimony:

"Q. My question is, you were not planning on stopping at the stop sign at the bottom of the hill, is that correct?

"A. To make a full stop, no, that—we don't—we never stop, make full stops unless there was traffic or something. That's just what bicyclists do. When we get to a stop sign, we look both ways, if there's nothing coming, we—I mean, we slow until maybe one or two miles an hour. But to stop means we have to get out of our pedals and put our feet down. . . .

"Q. I think you just said that you were going to slow, but, you were—you were not going to stop. Were you planning on stopping that day?

"A. Was I planning on coming to a full stop, probably not. . . .

"Q. Right. So, you didn't plan on stopping?

"A. Not to a full stop, no. . . .

"Q. My question is this, you didn't plan on stopping at the guardhouse, is that correct?

"A. That's correct.

"Q. Okay. And you didn't plan on stopping at the stop sign, is that correct?

"A. That is correct."

[7] Officer Melendez gave the following testimony:

"Q. Had you seen [the plaintiff] before the moment when you observed him being thrown off the bike?

"A. Yes.

"Q. Where did you observe him?

"A. I saw him come up the hill, and they went out through the backend of the—of the campus where the armed gate is situated.

"Q. So—so you saw him enter the campus?

"A. I saw him en—enter—I saw him go up the campus, but they didn't go by me or by the guardhouse.

"Q. They went up by the wind—by the wind farm.

"A. By the wind farm.

"Q. Okay. Did you call to any—withdrawn. Were there any other officers on campus at that time?

"A. There was another patrol officer.

"Q. Did you call to the other patrol officer to alert him to the presence of—of the bicyclists?

"A. At the time I did not do that. That's one of the reasons why I was out of the guardhouse. I was looking in the general area, seeing traffic, observing my—observing my surroundings. And—I—and usually I was expecting them to come back.

"Q. Okay. So, about how much time passed from the moment when while standing outside of the guardhouse you observed them, the two—there were two riders?

"A. There were two riders.

"Q. When you observed them right up the road past the wind farm to the time when they came back?

"A. Well, when they were coming up the hill, I was still in the guardhouse when they went back through the wind farms. There was a time I couldn't tell you how long. And that's when I exited the guardhouse and decided to look around the area; observe my area."

Officer Melendez further testified:

"Q. And can you just explain for the ladies and gentlemen of the jury again, why you were not in the guardhouse and where you were?

"A. I was in front of the guardhouse, towards the left side of it. I was surveying my area, my post. I had [seen] bicycles—bicyclists come up, and I thought they were still in the general area, but they didn't come by my gate. So, I was just surveying my area."

[8] The court instructed the jury on the duty owed to a trespasser as well as to a constant trespasser. Although used infrequently, our Supreme Court has recognized the status of constant trespasser where a heightened duty is owed when the possessor of land has knowledge that trespassers constantly intrude upon a limited area of the land. See *Morin* v. *Bell Court Condominium Assn., Inc.*, 223 Conn. 323, 333, 612 A.2d 1197 (1992). The court charged the jury as follows: "If a possessor of the land has knowledge that the trespassers constantly intrude upon a limited area of the land, the possessor of the land is liable for an artificial condition that caused injury to the trespasser on that part of the land if all of the following are met. The condition is one that the possessor has created or maintains and the condition is one that to the possessor's knowledge is likely to cause death or serious bodily harm to such trespasser. And the condition is of such nature—of such a nature that the possessor has reason to believe that such trespasser

will not discover it. And the possessor has failed to use reasonable care to warn such trespassers of [the] artificial condition and the risk involved."

[9] The Connecticut Civil Jury Instructions state on page one of the collection: "This collection of jury instructions was compiled by the Civil Jury Instruction Committee and is intended as a guide for judges and attorneys in constructing charges and requests to charge. The use of these instructions is entirely discretionary and their publication by the Judicial Branch is not a guarantee of their legal sufficiency." Connecticut Civil Jury Instructions, available at https://jud.ct.gov/JI/Civil/Civil.pdf (last visited October 3, 2019).

[10] Our Supreme Court has explained that a person "might be found to have been impliedly invited if he came to the premises under either of two sets of facts: First, because he was led to believe that [the premises] were intended to be used by visitors or passengers, and that such use was not only acquiesced in by the owner or person in possession and control of the premises, but that it was in accordance with the intention and design with which the way or place was adapted and prepared or allowed to be so used; or, secondly, he was using them with the acquiescence, actual or implied, of the defendant in pursuance of a matter of mutual interest." (Citation omitted; internal quotation marks omitted.) *Dym* v. *Merit Oil Corp.*, 130 Conn. 585, 588–89, 36 A.2d 276 (1944).

[11] We note that even if it was error for the court not to send the question of whether the plaintiff was a licensee to the jury, the plaintiff's one sentence harmfulness argument contained in his appellate brief was insufficient to address the harm of the court's alleged error. See *MacDermid, Inc.* v. *Leonetti*, 328 Conn. 726, 749, 183 A.3d 611 (2018) ("Specifically, with respect to jury instructions, we have explained that [i]t is axiomatic . . . that not every error is harmful. . . . [W]e have often stated that before a party is entitled to a new trial . . . he or she has the burden of demonstrating that the error was harmful." [Internal quotation marks omitted.]).

In light of the court's constant trespasser jury instruction; see footnote 8 of this opinion; which is substantially similar to the licensee instruction the plaintiff seeks, it would have been incumbent upon the plaintiff to address sufficiently the harm with respect to the court's alleged error. See *MacDermid, Inc.* v. *Leonetti*, supra, 328 Conn. 748 ("without adequate briefing on the harmfulness of an alleged error, the defendant is not entitled to review of [the] claim on the merits" [internal quotation marks omitted]).

[12] This court's recent decision in *Farmer-Lanctot* v. *Shand*, 184 Conn. App. 249, 194 A.3d 839 (2018), illustrates this principle. In *Farmer-Lanctot*, two defenses, a denial of negligence and a special defense of contributory negligence, could have supported the general verdict, and there was a claim of instructional error as to each ground. Id., 254. This court, therefore, considered the first claim of instructional error, which pertained to the negligence claim, as part of its analysis into whether there was a properly and adequately instructed defense that supported the verdict. Id., 254–59. This court concluded that the general verdict rule applied because there was no error in the instructions on the negligence claim, and, therefore, it did not need to consider the claimed errors relating to contributory negligence. Id., 258–59.

---